# 23-7348

## In the
## United States Court of Appeals
### For the Second Circuit

---◆---

FAIR HOUSING JUSTICE CENTER, INC.,

*Plaintiff-Appellee,*

– and –

ALFRED SPOONER,

*Plaintiff,*

– v. –

PELICAN MANAGEMENT, INC., FORDHAM ONE COMPANY, LLC.
and CEDAR TWO, LLC.,

*Defendant-Counter-Claimants-Appellants,*

– and –

GOLDFARB PROPERTIES and DEEGAN TWO COMPANY,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANTS-COUNTER-CLAIMANTS-APPELLANTS

ROBERT S. WOLF
DAVID RABINOWITZ
MOSES & SINGER, LLP
*Attorneys for Defendants-Counter-Claimants-Appellants*
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 554-7815
drabinowitz@mosessinger.com

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendants-Appellants certify that they have no parent corporation and that no publicly held corporation owns 10% or more of their stock.

i

## TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT ...............................................................i

TABLE OF CONTENTS ................................................... ii

TABLE OF AUTHORITIES ...........................................iv

INTRODUCTION................................................................1

JURISDICTIONAL STATEMENT .................................4

STATEMENT OF THE ISSUES.....................................4

STATEMENT OF THE CASE .........................................7

FACTS..................................................................................7

    A.   DEFENDANTS-APPELLANTS' APPLICATION CRITERIA AND POLICIES................................9

    B.   THE DECISION BELOW ................................18

SUMMARY OF ARGUMENT.........................................19

ARGUMENT ....................................................................20

I.    STANDARD OF REVIEW ......................................20

II.   PLAINTIFF FAILED TO REBUT DEFENDANTS-APPELLANTS' SHOWING OF NO ADVERSE EFFECT. ...............................21

    A.   INSUFFICIENT VOUCHERS ......................22

    B.   NO CONTACT APPLICANTS ......................29

5559915v6

III.  THE DISTRICT COURT ERRED IN FINDING A DISPARATE
      ADVERSE EFFECT ON ONLY A SUBGROUP OF RENT
      SUBSIDIZED APPLICANTS CONTRARY TO ESTABLISHED
      SECOND CIRCUIT PRECEDENT ............................................................32

**CONCLUSION**...................................................................................................37

iii

# TABLE OF AUTHORITIES

Page(s)

Cases

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79,*
    691 F. Supp. 2d 372 (S.D.N.Y. 2009) ...................................................34

*Boucher v. U.S. Suzuki Motor Corp.,*
    73 F.3d 18 (2d Cir. 1996).......................................................................24

*Criley v. Delta Airlines, Inc.,*
    119 F.3d 102 (2d Cir. 1997)..............................................................2, 31

*Darensburg v. Metropolitan Transp. Comm.,*
    636 F.3d 511 (9th Cir. 2011) .........................................................35, 36

*Eidinger v. PRIMMA, LLC,*
    2022 WL 17685444 (E.D.N.Y. Nov. 1, 2022) .....................................34

*Lowe v. Commack Union Free Sch. Dist.,*
    886 F.2d 1364 (2d Cir. 1989)............................................................3, 33

*Major League Baseball Props., Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008).................................................................24

*Mancuso v. Douglas Elliman, LLC,*
    808 F. Supp. 2d 606 (S.D.N.Y. 2011) ...................................................8

*McReynolds v. Sodexho Marriott Services, Inc.,*
    349 F. Supp.2d 1 (D.D.C. 2004) ....................................................35, 36

*Mencer v. Princeton Square Apartments,*
    228 F.3d 631 (6th Cir. 2000) .................................................................8

*Smith v. City of Jackson,*
    544 U.S. 228 (2005).............................................................................13

*Smith v. Xerox Corp.,*
    196 F.3d 358 (2d Cir. 1999)............................................ 2, 33, 34, 35, 36

*Texas Department of Housing and Community Affairs v. Inclusive Communities*
    *Project,* 576 U.S. 519 (2015).............................................................31

*Tsombanidis v. West Haven Fire Dept.,*
    352 F.3d 565 (2d Cir. 2003).........................................................34, 36

*Wharff v. State Univ. of New York,*
    413 Fed. Appx. 406 (2d Cir. 2011).......................................................34

*Woodbury v. New York City Transit Auth.,*
    832 F.2d 764 (2d Cir. 1987)................................................................20

iv

## Statutes

28 U.S.C. § 1291 ...................................................................................4
28 U.S.C. § 1331 ...................................................................................4
28 U.S.C. § 1367 ...................................................................................4
28 U.S.C. § 2201 ...................................................................................4
42 U.S.C. § 3601 ...................................................................................4
New York State Executive Law Section 296 ..........................................4

## Rules

Fed. R. App. 32(a)(5) ...........................................................................39
Fed. R. App. 32(a)(6) ...........................................................................39
Fed. R. App. 32(a)(7)(B) ......................................................................39
Fed. R. App. 32(a)(7)(B)(iii) ...............................................................39
Fed. R. Civ. P. 13(a) ..............................................................................4
Federal Rule of Evidence 702(b) .........................................................24
Rule 26.1 of the Federal Rules of Appellate Procedure .......................... i

## Other Authorities

Section 8-107(5)(a) of the New York City Administrative Code............4

v

## INTRODUCTION

The judgment below improperly prohibits an otherwise lawful policy for approving or denying applications to rent apartments. The judgment below also improperly prohibits this otherwise lawful policy because of its mistakenly perceived disparate adverse effect on a select subset of government-subsidized applicants. Because the Court below committed clear error in finding this disparate adverse effect and resultant unlawful discrimination, the judgment below should be reversed.

Defendants-Appellants proved that government-subsidized apartment applicants were approved at higher rates than unsubsidized applicants under the application policy that they implemented in 2019. Defendants also proved and the Court found that their 2019 policy was lawful.

However, the Court below improperly determined that plaintiff had rebutted defendants' evidence and thus mistakenly concluded that there was a disparate adverse effect. The Court below made three clear errors in doing so: First, it accepted plaintiff's expert's speculation that some of defendants' approval/denial statistics might be unreliable. Second, it imposed legal obligations upon defendants that went beyond what is legally required.

Third, the Court did not look at the entire group of government rent subsidy holders to determine if defendants discriminated on the basis of government rent

1

subsidies. Instead, the Court accepted plaintiff's model of looking only at a special selection of subgroups of government rent subsidy holders: Only 3 out of the 6 rent subsidy programs were identified to the Court and, even within those 3 programs, only applicants whose rent was not fully paid by their subsidies. The Court disregarded applicants holding full rent subsidies from the Section 8, HIV/AIDS Services Administration (HASA) and Olmstead programs. The Court disregarded all applicants from the Special on-Time Only Assistance (SOTA), FHEPS (Family Homelessness and Eviction Prevention Supplement) and CityFHEPS programs.

Considering only selected subgroups of government rent subsidy holders was flatly contrary to Second Circuit law. See Point III, below. The Second Circuit has rejected claims of disparate impact based upon subgroups of a protected class because the fundamental notion of disparate impact is that the neutral policy has an adverse effect on a protected class as a whole, not an arbitrary subset of the protected class. *See, Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999) ("In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset."); *Criley v. Delta Airlines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (affirming summary judgment in

2

favor of defendant where plaintiffs acknowledged that the policy at issue had "no negative impact" on the entire protected group).

The disparate impact must affect the entire protected class, not just a subgroup of the protected class. *See Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989) ("Appellants in effect ask us to expand the disparate impact approach so as to include recognition of 'sub-groups' … We find no support in the case law or in the ADEA for the approach to disparate impact analysis appellants advocate.")

Based on this erroneous finding of a disparate adverse effect, the Court below found defendants-appellants liable for discrimination in connection with the otherwise lawful 2019 policy and imposed injunctive and other prospective relief. In addition, the Court's decision to impose punitive damages on defendants may have been influenced by the Court's erroneous finding of continued discrimination after 2018.

For these reasons, the judgment below should be reversed insofar as it finds defendants liable for discrimination in connection with their 2019 policy and grant prospective relief. Defendants should be granted judgment declaring that their 2019 apartment application policy is lawful, all injunctive and other prospective relief should be vacated, and the case should be remanded to the District Court for reconsideration of its award of punitive damages.

3

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. § 1331 because one of plaintiff's claims arose under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* The District Court had jurisdiction of plaintiff's state law claims under 28 U.S.C. § 1367. The District Court had jurisdiction of defendants' counterclaim under 28 U.S.C. § 1367, Fed. R. Civ. P. 13(a), 28 U.S.C. § 2201 and, defendants submit, under 28 U.S.C. § 1331 because defendants' counterclaim arose under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

The District Court entered a final judgment and injunction order on September 29, 2023, and Appellants filed a timely notice of appeal on October 11, 2023. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment.

## STATEMENT OF THE ISSUES

1.      Did the District Court err in concluding that defendants-appellants' 2019 policy for evaluating applications for rental apartments violated Section 8-107(5)(a) of the New York City Administrative Code — the New York City Human Rights Law — and New York State Executive Law Section 296 only to the extent that it discriminated against partially subsidized applicants? However, defendants-appellants are correct that it is not unlawful for a landlord to ask about income or assess an applicant's ability to pay for housing, so long as they do not discriminate

4

based on the subsidy, a lawful source of income. The source of income statute only forbids discrimination; it does not require landlords to accept applicants with subsidies regardless of the amount of their incomes.

2. Did the District Court err in determining that defendants-appellants' otherwise lawful 2019 policy for evaluating applications for rental apartments created an adverse disparate impact on applicants whose rent would be partially government subsidized?

3. Did the District Court err in concluding that plaintiff had presented evidence sufficient to carry its burden to rebut defendants-appellants' prima facie showing that defendants-appellants' 2019 policy for evaluating applications for rental apartments did not create an adverse disparate impact on applicants whose rent would be partially government subsidized?

4. Did the District Court err in according probative value to the opinion of plaintiff's expert unsupported by evidence that defendants-appellants' count of applicants whose government subsidies were not valid for the apartments applied for was incorrect?

5. Did the District Court err in according probative value to the opinion of plaintiff's expert unsupported by evidence that defendants-appellants had applied a discriminatory Applicable Standard of Review in pursuing applicants for apartments

5

who had dropped out of the application process whose rent would be partially government subsidized?

6. Did the District Court err in determining that defendants-appellants' count of applicants whose government subsidies were not valid for the apartments applied for was incorrect based solely on the fact that more than one-quarter of such applicants were denied for that reason?

7. Did the District Court err in determining that defendants-appellants' otherwise lawful 2019 policy for evaluating applications for rental apartments unlawfully discriminated based on source of income by considering the effect of the 2019 policy only on three arbitrarily selected subgroups of government subsidy holders and further considering the effects solely on those subsidy holders in those three subgroups whose subsidies paid for part but not all of their rent?

8. Did the District Court err in granting plaintiff prospective relief relating to defendant-counterclaimants' evaluation of applications for rental apartments when defendant-counterclaimants had instituted and had been applying the otherwise lawful 2019 income evaluation policy for four years at the time the relief was granted?

## STATEMENT OF THE CASE

This is an action against a residential landlord seeking relief for purported discrimination in renting apartments on the basis of disability and source of income. Defendants (collectively, "Goldfarb") counterclaimed for a declaration that the procedure that they instituted in 2019 for determining whether to approve or reject applications for apartments was lawful.

The case was tried without a jury before United States District Judge Judge Edgardo Ramos of the Southern District of New York. Judge Ramos found for plaintiff on the claims in the Second Amended Complaint and against Goldfarb on its counterclaim. The decision has been reported at 2023 WL 6390159 but not officially.

## FACTS

Goldfarb owns and operates rental apartment buildings in New York City and Westchester County. Goldfarb's apartments, known for being well-maintained, are highly sought after. R. JA-425 ¶¶ 5-8; R. JA-1605; R. SPA-14. Goldfarb receives significantly more applications than available apartments, reflecting their desirability. R. JA-1349 (Table).

Goldfarb incurs substantial expenses in operating its buildings – real estate taxes, employee salaries, mortgage payments, insurance and many more – and Goldfarb suffers substantial losses when tenants stop paying rent and legal action is

7

required to collect rent or to evict non-paying tenants. R. JA-470 ¶ 24; R. JA-471 ¶ 13. Goldfarb therefore has a crucial interest in renting only to tenants who can afford and will reliably pay the rent.

To decide which prospective tenants to approve, Goldfarb maintains a set of application criteria to determine whether the applicant would be a suitable tenant able and willing to pay the rent. R. JA-1209; R. JA-1213; R. JA-1219; R. JA-1454 ¶ 20. The only way to measure the ability of an applicant to afford the rent is to examine the applicant's income or wealth or a combination of both. Hence, determining whether an applicant will be able to pay the rent is crucial to Goldfarb's business and to avoiding a high rate of rent arrears. R. JA-1441 ¶¶ 8-11, R. JA-447 ¶ 25, R. JA-451 ¶ 20. For this reason, courts that have addressed the question, including the Court below (R. JA-1639; R. SPA-47), have consistently held that assessing an applicant's income is a legitimate, nondiscriminatory practice. *See Mencer v. Princeton Square Apartments*, 228 F.3d 631, 635 (6th Cir. 2000) (no housing discrimination where plaintiff's finances doubtful: "The Mencers also failed to meet the defendant's income formula."); *Mancuso v. Douglas Elliman, LLC*, 808 F. Supp. 2d 606, 618-19 (S.D.N.Y. 2011) (quoting *Mencer* and citing income formula cases as applying "relevant criteria") A prima facie case under the Fair Housing Act requires the plaintiff to show "that they sought and were qualified to rent or purchase the housing"

Plaintiff-appellee, Fair Housing Justice Center, Inc., ("FHJC") itself has taken the position that determining whether a subsidized applicant's income is sufficient to pay the rent should be measured by the portion of the rent that such an applicant will pay, rather than the entire rent. R. JA-115 ¶ 66, R. JA-116 ¶ 68, R. JA-118 ¶ 79; R. JA-1454; R. JA-1446 ¶ 27; R. JA-1088 ¶ 27; 13 R. JA-500 ¶ 13; R. JA-501 ¶ 3.; R. JA-592 ¶ 23; R. JA-593 ¶ 23. FHJC has thereby conceded that landlords may lawfully make such a determination. Indeed, the Court specifically found that the source of income statute "does not require landlords to accept applicants with subsidies regardless of the amount of their incomes." See R. JA-1637; R. SPA-46.

## A.    Defendants-Appellants' Application Criteria and Policies

Before 2015, Goldfarb did not have a company-wide policy for determining how much income an applicant had to have relative to the apartment rent to be deemed able to afford the rent; its tenant application and approval system was decentralized. Because of concerns about high tenant rent arrears Goldfarb decided to create a centralized credit department and adopt company-wide criteria (the "2015 Policy") for applications. R. JA-1606, R. JA-1607; R. SPA-15, R. SPA-16, R, JA-447 ¶25, R. JA-451 ¶ 20, R. JA-452 ¶¶ 8-11; R. JA-1441, R. JA-1442 ¶¶ 9-11; R. JA-1443, R. JA-144 ¶¶17-19.

The 2015 policy required a gross annual income equal to at least 43 times the monthly rent and a net income where the monthly rent did not exceed 40% of the

applicant's net monthly income. R. JA-1607; R. SPA-16, R; R. JA-1445 ¶ 24.

This case was brought against Goldfarb's 2015 Policy. FHJC and individual plaintiff Alfred Spooner claimed that the 2015 Policy discriminated on grounds of disability under the federal Fair Housing Act and on grounds of source of income under the New York City Human Rights Act. R. JA-102 ¶¶ 5-6.

After settling the claim of the individual plaintiff, the parties attempted to settle FHJC's claims. During settlement discussions with FHJC, Goldfarb decided to approve the change in its income criteria for subsidized applicants that FHJC endorsed in the Amended Complaint and the Second Amended Complaint (R. JA-67 ¶ 66, R. JA-68 ¶¶ 66, 68, 79; R. JA-115 ¶ 66, R. JA-116 ¶¶ 66, 68, 79), namely, to measure the adequacy of subsidized applicants' income by comparing it with the portion of the rent that the applicant was expected to pay, rather than the entire rent for the apartment. R. JA-1446 ¶ 26; R. JA-510 ¶ 21 to R. JA-510 ¶ 5.

Goldfarb provisionally and privately changed its income criteria as aforesaid in January 2019 in anticipation of settlement. When settlement proved impossible, Goldfarb made the change permanent anyway and announced it publicly in May 2019 (the "2019 Policy"). R. JA-250 ¶¶ 16-18, R. JA-251 ¶ 3; R. JA-1454; R. JA-1209; R. JA-1213; R. JA-1219. Goldfarb applied the 2019 Policy to all subsidized applicants after January 2019. R. JA-317 ¶¶ 9-22; R. JA-374 ¶¶16-18.

10

Goldfarb thereafter filed a counterclaim for a declaration that the 2019 Policy is lawful. R. JA-145.

**2019 Policy**

Goldfarb's 2019 Policy categorized applications into three groups based on subsidy status: "No Subsidy," "Partial Subsidy," and "Full Subsidy." R. JA-1447 ¶ 30; R. JA-1454 ¶ 5; R. JA-1213; R. JA-1219; R. JA-1209.

- No Subsidy Applications: Applicants under this category need to meet multiple criteria, including a minimum credit score of 650 and a gross annual income at least 43 times the monthly rent. Additional requirements include a rent-to-net income ratio not exceeding 40%, verified income sources, debt service documentation, positive rental history, employment documentation, and acceptable criminal history. The rent-to-net income ratio criterion requires a net monthly income of at least 2.5 times the rent (R. JA-1213; R. JA-1219; R. JA-1209; R. JA-251 ¶¶ 18-22).

- Partial Subsidy Applications: For applicants in this category, financial thresholds are adjusted in proportion to the rent subsidy. The gross annual income must be 40 times their portion of the rent post-subsidy,

11

and the rent-to-net income ratio is calculated based on this adjusted rent amount (R. JA-1213; R. JA-1219; R. JA-1209; R. JA-251 ¶¶ 2-25).

- <u>Full Subsidy Applications</u>: Applicants with full subsidies are exempt from income and credit checks, needing only to provide acceptable criminal history, a completed application form, an unexpired rent subsidy voucher, and the first month's rent and security deposit, which may be payable via voucher (R. JA-1213; R. JA-1219; R. JA-1209; R. JA-251 ¶ 23, R. JA-252 ¶ 1).

FHJC did not claim that the 2019 Policy presented a case of intentional discrimination. FHJC also did not claim that the 2019 Policy discriminated on the basis of disability. R. JA-599 ¶ 24, R. JA-600 ¶ 2.

The only claim made by FHJC concerning Goldfarb's 2019 Policy was that it discriminated on the basis of source of income by causing a disparate adverse effect on a certain subset of individuals chosen by FHJC from among all individuals holding government rent subsidies. FHJC claims that holders of rent subsidies under the Section 8, HASA and Olmstead programs (but not the Special One-Time Assistance program, the FHEPS or CityFHEPS programs) whose subsidies only paid for part of the rent (but not subsidies that paid all of the rent) suffered a disparate

12

adverse impact. R. JA-163; R. JA- 1141 ¶ 131, R. JA-1144 ¶ 144, R. JA-1149 ¶¶ 170-171, R. JA-1157 ¶ 200.

Picking out certain subgroups out of all rent subsidy holders was essential to FHJC's claim that the 2019 Policy discriminates against applicants based on "source of income." Even if holders of <u>full</u> rent subsidies under the three programs selected by FHJC as well as partial subsidy holders were included, as Dr. White did, there is no adverse disparate effect and FHJC does not claim otherwise. R. JA-1339; R. JA-562 ¶ 24 to R. JA-563 ¶ 18. Looking broadly at government rent subsidy holders instead, there is no adverse disparate impact – and the law forbids discrimination on the basis of "source of income," not on the basis of "holding partial rent subsidies under FHJC's three programs."

### The 2019 Policy, If Anything, Favors Subsidized Applicants

Goldfarb's counterclaim therefore turned on the question of disparate adverse impact on subsidized applicants caused by the 2019 Policy. Policies causing a disparate adverse impact are those that are "facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another…" *Smith v. City of Jackson*, 544 U.S. 228, 239–40 (2005).

The statistics concerning the effect of Goldfarb's 2019 Policy make it absolutely clear that it produced no disparate adverse impact on the basis of source of income, here meaning government rent subsidies. This remains true whether or

13

not you look at the impact on the select subset of partially rent-subsidized applicants picked by FHJC, or also include full subsidy holders under those programs or, also include rent-subsidized applicants in general.

- **More Subsidized Applicants Are Approved By Goldfarb Under The 2019 Policy Than Unsubsidized Applicants**

Proportionately more subsidized applicants are approved under the 2019 Policy than unsubsidized applicants, 47% to 34%, even looking only at the subset of subsidized applicants that FHJC picked to bring this case.

These percentage figures come from the report of Goldfarb's expert Dr. Paul White's report, R. JA-1400, which shows that 81 out of 170 Section 8 and HRA (which includes HASA) applicants were approved by Goldfarb, or 47%, vs. 689 out of 1993 unsubsidized applicants, or 34%. Most importantly, the figures for subsidized applicants include only those whose subsidies were valid for the apartments they applied for and who did not voluntarily drop out of the application process before it concluded. These figures also do not include the single Olmstead program applicant, who voluntarily dropped out of the application process. R. JA-1349 (Table). But FHJC picked just three out of at least six government rent subsidy programs active in New York. Goldfarb's subsidized applicant approval figure rises to 54% if all rent subsidy programs are considered, rather than just the three that FHJC selected in this case.

14

In addition to FHJC's three selected programs, there are rent-subsidy programs in New York called SOTA, FHEPS and CityFHEPS. SOTA is New York City's Special One-Time Assistance program. https://www.nyc.gov/site/hra/help/sota.page. FHEPS is a rent supplement for families with children who receive cash assistance and have been evicted or are facing eviction, who lost their housing due to a domestic violence situation, or who have lost their housing because of health or safety issues. https://www.nyc.gov/site/hra/help/fheps.page. CityFHEPS is a rental assistance supplement to help individuals and families find and keep housing. https://www.nyc.gov/site/hra/help/cityfheps.page. See also R. JA-1453 ¶¶ 14-15.

Considering all of those rent subsidy programs, 136 out of 251 subsidized applicants were approved by Goldfarb, resulting in an approval rate of 54%, as against only 34% for unsubsidized applicants. See R. JA-1401, Scenario 13; R. JA-1339.

- **Goldfarb's Challenged Applicant Income Criteria Eliminate More Unsubsidized Applicants Than Subsidized Applicants**

Even among FHJC's three selected programs and even for partial subsidy holders only, according to FHJC's expert's figures, the income criteria under Goldfarb's 2019 Policy eliminate proportionately more unsubsidized applicants than the subsidized applicants selected by FHJC, 374 out of 1,993 unsubsidized to 37 out

15

of 306[1] subsidized, 18.8% to 12%.[2] R. JA-1155; R. JA-1464. Thus, in terms of disparate impact, Goldfarb's challenged applicant income criteria <u>strongly favor even FHJC's chosen subset</u> of subsidized applicants over unsubsidized applicants. R. JA-1226; R. JA-1459 ¶ 34; R. JA-1155 (Table 24); R. JA-549 ¶¶ 1-8, 15; R. JA-550 ¶ 1.

If SOTA, FHEPS CityFHEPS are also considered, the denial percentages remain higher for unsubsidized applicants: 19% for unsubsidized applicants vs. 13% for subsidized applicants. R. JA-1401, Scenario 14.

- **Goldfarb's Challenged Credit Criteria Eliminate More Unsubsidized Applicants Than Subsidized Applicants**

Again, even among FHJC's three selected programs, Goldfarb's challenged credit criteria eliminate proportionately more unsubsidized applicants than

---

[1] The subsidized figures include both full subsidy holders (3/91) and partially subsidized holders (34/215).

[2] FHJC's expert gives an alternative set of figures that includes individuals whose vouchers were not valid for the apartments applied for and individuals who dropped out of the application process. The resulting percentages are slightly different, but favor subsidized applicants even more: 16.1% to a total of 5.2% (374/2,329 unsubsidized, 37/714 subsidized). See also Trial Transcript R. JA-548 ¶ 14, R. JA-549 ¶ 15, where Dr. Steil concedes that on his figures, which ignore full subsidy voucher holders, Goldfarb's income criterion falls more heavily on <u>unsubsidized</u> applicants, eliminating 16% of them vs. 6% of partially subsidized applicants.

16

subsidized applicants, 40% to 19%. See R. JA-122; R. JA-1339; R. JA-1449 ¶ 19;
R. JA-1464; R. JA-1155 (Table 24); R. JA-549 ¶ 1-8, 15, R. JA-550 ¶ 1; R. JA-1357
to R. JA-1359.

Indeed, the approval and denial figures for FHJC's chosen subset of subsidy
holders come not from Goldfarb's expert, but actually from FHJC's expert. See R.
JA-1155 (Table 24); R. JA-549 ¶¶ 1-8, 15, R. JA-550 ¶ 1.

Goldfarb's expert, Dr. White, reviewed the statistics concerning the 2019
Policy and specifically analyzed the statistical information for the period May 2019-
August 2020 in his 2021 report. In that report, Dr. White concluded that:

> [P]rogram applications are not denied more than expected
> when compared to non-program applications due to the
> income and credit requirements of Goldfarb's new 2019
> Policy. There were no statistically significant adverse
> effects on program applicants regardless of voucher type
> (Section 8, HRA, SOTA, CityFHEPS, and FHEPS, or
> combined) or decision being analyzed (insufficient credit,
> insufficient income, or combined). (emphasis added).

R. JA-1362.

The statistics make it apparent that subsidized applicants with vouchers valid
for the apartments applied for were being approved by Goldfarb at rates much higher
than unsubsidized applicants and that the specific selection criteria challenged by
FJHC – income and credit - also favored subsidized applicants.

17

### FHJC's Expert's Faulty Attempt To Rebut The Statistics

FHJC's expert, Dr. Justin Steil, attempted to rebut Goldfarb's statistics and Dr. White's analysis. However, as discussed in detail below in section II, Dr. Steil's rebuttal failed because it lacked any factual basis and because Dr. Steil's rebuttal would require Goldfarb to exceed the non-discrimination mandated by law and take otherwise unrequired special measures to obtain tenants with government subsidies.

### B.     The Decision Below

The District Court found that Goldfarb's 2015 policy discriminated on the basis of disability and source of income. This finding is not appealed from except insofar as determination of this appeal may affect the decision of the Court below to impose punitive damages and prospective relief.

The District Court determined that it is not unlawful for a landlord to ask about income or assess an applicant's ability to pay for housing.  Nor does the source of income statute require landlords to accept applicants with subsidies regardless of the amount of their incomes. The source of income statute only forbids discrimination and the District Court found that Goldfarb's 2019 policy discriminated on the basis of source of income under the New York City Human Rights Law. It is this finding and the grant of injunctive and other prospective relief that is the subject of this appeal. For the reasons discussed below, Goldfarb respectfully submits that the District Court committed clear error.

18

# SUMMARY OF ARGUMENT

The sole basis for the District Court's finding of discrimination by the 2019 Policy was an alleged disparate adverse effect of that policy's application process on rental applicants holding certain select kinds of government subsidies and, within that group, only subsidies that paid for part but not all of the rent. This conclusion was error because: (1) Goldfarb's statistics clearly demonstrated by uncontroverted evidence that the 2019 Policy approved an equal or greater percentage of applicants whose subsidies were valid for the apartments they applied for, as compared with unsubsidized applicants. This was true whether partially subsidized applicants were viewed in isolation or whether the computation included all government rent-subsidy programs or just those picked by FHJC. (2) The District Court improperly considered the statistics concerning partially subsidized applicants in isolation. In judging whether Goldfarb discriminated against subsidized applicants based on source of income, the Court was required to consider all government rent subsidized applicants, whether partially or wholly subsidized, rather than the specially selected, partially subsidized group proffered by FHJC.

# ARGUMENT

## I.  STANDARD OF REVIEW

> Because this data formed the exclusive statistical basis for the district court's conclusion, **and because the court clearly misapprehended the nature of the data and disregarded testimony as to its proper interpretation, we do not hesitate to characterize its finding of intentional discrimination as clearly erroneous**. (emphasis added)

*Woodbury v. New York City Transit Auth*., 832 F.2d 764, 770 (2d Cir. 1987).

In the instant matter the District Court clearly erred when it clearly misapprehended the statistics presented by the parties. Dr. White's statistics correctly distinguished valid vouchers from insufficient ones, and individuals who completed the application process from those who dropped out. However, the Court improperly accepted FHJC's expert's version of the statistics, which included applicants with insufficient vouchers and applicants who dropped out of the application process in assessing disparate adverse effect. This resulted in a "fundamental misreading of the data," which should be "fatal to [the Court's] finding of intentional discrimination" by "disregard[ing] testimony as to its proper interpretation." *Woodbury, id*. at 770. The District Court's faulty reading of the statistics created a disparate impact where there was none.

20

## II.   PLAINTIFF FAILED TO REBUT DEFENDANTS-APPELLANTS' SHOWING OF NO ADVERSE EFFECT.

Goldfarb sufficiently proved that applicants with vouchers that were valid for the apartments they applied for were approved at the same or greater rates than applicants without vouchers. This proved that Goldfarb's 2019 Policy did not have a disparate adverse effect on voucher holders.

Nevertheless, the Court, while finding that the 2019 Policy was lawful, concluded that the 2019 Policy produced an adverse disparate effect on applicants holding vouchers that covered some but not all of the rent. R. JA-1639; R. SPA-48. The Court erroneously reached its conclusion by including as applicants adversely affected by the 2019 Policy those who were denied because their vouchers were invalid for the apartments they applied for and those who submitted and then abandoned applications by failing to respond to follow-up contacts from Goldfarb. The Court reached its conclusion based on the testimony of Dr. Justin Steil, FHJC's expert, who claimed that Goldfarb's 2019 Policy produced an adverse disparate effect on partial voucher holders. R. JA-1622 to R. JA-1624, R. JA-1639; R. SPA-31 to R. SPA-35, R. SPA-48.

Goldfarb respectfully submits that this was clear error: An application policy cannot produce an adverse effect on voucher holders who have vouchers that are invalid for the apartments applied for. Similarly, an application policy cannot

produce an adverse effect on voucher holders who abandon and fail to complete the application process before Goldfarb has approved or denied their applications.

### A.    **Insufficient Vouchers**

The Court below recognized that whether to include insufficient voucher applicants was "pivotal." R. JA-1621 to R. JA-1622; R. SPA-30 to R. SPA-31. However, the Court incorrectly decided that "Dr. Steil's methodology of including 'insufficient voucher' as a denial category was proper." R. JA-1623; R. SPA-32. This decision was clear error and without it there was no adverse disparate effect on even partial voucher holders, much less all voucher holders.

The unsuccessful rebuttal testimony of Kianna Glanton was a clear example of actual evidence of an "insufficient voucher" that the Court determined Goldfarb properly rejected, dismissing FHJC's claim that it was a "baseless exclusion." R. JA-1638; R. SPA-47.

As Dr. White testified at trial, the key difference between his analysis and Dr. Steil's is that Dr. Steil counted those applicants as subsidized applicants even though their subsidies were not valid for the apartments applied for and they were thereby unsubsidized as far as those apartments were concerned. See R. JA-666 ¶ 20, R. JA-667 ¶ 14.

There are monetary limits on the rents that the government rent subsidy programs will pay for. Depending on apartment size and a few other factors, each

voucher has a certain dollar limit or "cap." See R. JA-1455 ¶ 22; R. JA-1405; R. JA-556 ¶ 25, R. JA-558 ¶ 11. Many subsidized applicants apply for apartments that have higher rents than their programs will pay, and thus are in the same position as unsubsidized applicants regarding those apartments. A voucher with a limit of $2,500/month will pay nothing for an apartment costing $2,600/month. Without their subsidies, those applicants cannot meet Goldfarb's income requirements. See R. JA-1405; R. JA-1454 ¶¶ 20-23; R. JA-1464; R. JA-556 ¶¶ 16-21, R. JA-563 ¶¶ 6-18, R. JA-564 ¶¶ 9-14.

Nevertheless, Dr. Steil ignored that fact and still counted as valid applicants those who applied for apartments that their vouchers would not pay for. See R. JA-556 ¶¶ 16-21, R. JA-563 ¶¶ 6-18, R. JA-564 ¶¶ 9-14.

The specific reason given by the District Court for adopting Dr. Steil's methodology of including partial voucher holders with insufficient vouchers was "because it accounts for 'more than one out of every four' denials of applicants with subsidies." (quoting Dr. Steil's affirmation). R. JA-1623; R. SPA-32. This again was clearly erroneous. Without question, the number of applicants properly rejected by an application criterion, standing alone, cannot be relevant to the propriety of the rejections. Indeed, it was undisputed that partial voucher applicants who had insufficient vouchers were properly rejected. Thus, if all of the partial voucher applicants had applied for apartments for which their vouchers were insufficient, all

23

of those applicants would have properly been rejected and could not provide a basis for a determination of unlawful discrimination. The fact that "more than one out of every four" denials of voucher holders were because the vouchers were invalid does not mean that any of them were adversely affected by the 2019 Policy.

Dr. Steil criticized Goldfarb's insufficient voucher statistics in an effort to rebut Goldfarb's showing of no adverse effect. However, Dr. Steil's criticisms were both unsupported by evidence and sought to impose on Goldfarb obligations going beyond equal, non-discriminatory treatment of subsidized applicants that were simply not required by law. Expert testimony that is "speculative or conjectural" is inadmissible. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). Expert opinions not supported by evidence do not meet the standard for expert testimony. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (rejecting expert's conclusory statement where it was not accompanied by "any evidentiary citation"). Federal Rule of Evidence 702(b) requires that expert testimony be "based on sufficient facts or data."

Dr. White, Goldfarb's expert, stated that applications were denied for voucher insufficiency when the applicant applied to an apartment with a higher rent than the voucher limit. R. JA-1622; R. SPA-31. Dr. Steil maintained that this is "not necessarily true and can change depending on a determination of three options." R.

24

JA-1622; R. SPA-31. Dr. Steil's "options," however, do not show that any applicants were improperly classified as voucher insufficient.

Dr. Steil's first "option" was "what rent amount to use, which may be the rent for the unit the applicant applied for or the rent for another comparable apartment." R. JA-1622; R. SPA-31. But the question was whether Goldfarb improperly classified as insufficient voucher applications where the vouchers were insufficient for the specific apartment applied for, not for some other apartment. This first "option" sought to impose on Goldfarb an obligation in addition to non-discrimination in considering applications, namely, the obligation to find another apartment for an applicant who applies for a specific apartment the applicant cannot otherwise afford, because the voucher is invalid for that apartment. For that reason alone, Dr. Steil's first "option" does not show that those applicants suffered an adverse effect from Goldfarb's 2019 Policy.

In addition, as the Court noted, "Goldfarb did engage in this practice at times." R. JA-1622; R. SPA-31. As the Court said, Mr. Miller testified that when the apartment applied for was not available, a Goldfarb leasing agent contacted the applicant to see if the applicant would be interested in another apartment in the same building. *Id.* This practice went beyond mere non-discrimination and there was no indication that subsidized applicants were treated differently. See R. JA-334 ¶ 20, R. JA-335 ¶ 17.

25

Dr. Steil's second "option" was to note that "there is discretion in the HASA program to pay higher amounts if it is beneficial to the health of that applicant…" R. JA-1622-1623; R. SPA-31-32. However, there was absolutely no evidence that Goldfarb rejected any HASA voucher holders who obtained "higher amounts" from HASA, thereby disposing of any argument that Goldfarb incorrectly rejected such applicants for voucher insufficiency. (HASA is a program that gives assistance to individuals with HIV/AIDS.) In addition, as with all of Dr. Steil's "options," this option would have required Goldfarb to be privy to information it does not receive. HRA issues vouchers in addition to HASA recipients and there was no way for Goldfarb to tell from a tenant's application whether they had a HASA voucher or were disabled or even that they had a voucher at all. R. JA-280 ¶¶ 14-21, R. JA-311 ¶¶ 3-8, R. JA-312 ¶ 23, R. JA-313 ¶ 8; R. JA-381 ¶¶ 10-22; R. JA-616 ¶¶ 16-19; R. JA-1348.

Moreover, despite having had access to Goldfarb's tenant files, Dr. Steil provided no examples of cases where higher subsidy amounts were available or if they were, that Goldfarb failed to urge the voucher holder to apply for them. In any event, no legal authority was presented by FHJC or Dr. Steil to show that Goldfarb was required to take extra steps to see if they could qualify for apartments, even though the applicant applied for a unit that was not within the applicant's voucher's payment limit. Indeed, the Court confirmed that is not required by law.

26

Dr. Steil's testimony that this option might have been available to HASA voucher holders was therefore unsupported by any evidence and was rank speculation as to any effect it might have had on the approval and denial statistics. For all Dr. Steil knew, Goldfarb might have received and approved such applicants, or that no such applicants existed.

Dr. Steil also speculated that some of the Section 8 subsidy applicants could have made up the gap between the rent limits on their vouchers and the apartment rent by adding 10% of their adjusted gross incomes to the rent payments. Dr. Steil asserted that he had found "more than 15" such cases in examining the application data provided him by Goldfarb. See R. JA-1153 ¶ 188.

However, Dr. Steil did not identify any of those more than 15 applicants or examine the figures provided to him to calculate whether in fact any of those applicants could have made up the difference. See R. JA-587 ¶ 11, R. JA-588 ¶ 19. Moreover, Christopher Miller, Goldfarb's Leasing Director, testified without contradiction that Goldfarb takes that option into account when calculating whether the vouchers of such applicants are insufficient, adding 10% of Section 8 applicants' incomes to the rent limit for their vouchers. R. JA-1455, ¶¶ 24-25, R. JA-336 ¶ 14, R. JA-337 ¶ 14. Neither FHJC nor the Court cited any evidence that Goldfarb failed to take this option into account or that any failure to do so would have been in sufficient numbers to rebut Goldfarb's showing of no disparate adverse effect.

Dr. Steil's third "option" was "as explicitly set out in Section 8 regulations, a determination of whether the applicant may be able to afford to contribute more to the rent than their expected share in order to afford a rent higher than the voucher payment standard." R. JA-1622; R. SPA-31. This possibility of paying "more than their expected share" was not an option freely available to the applicants, even if they wanted to: the voucher-granting authority had to consent. In addition, as with Dr. Steil's other "options," this option required Goldfarb to go beyond non-discrimination in considering applications. It would have required Goldfarb to go beyond assessing whether the applicant had enough income to meet Goldfarb's requirements based on the voucher presented and additionally explore whether the applicant (1) was interested in paying more than the applicant's expected share and (2) had applied to or was willing to apply to the granting authority for permission to pay more. For this reason alone this third option did not rebut Goldfarb's showing that applicants classified as insufficient voucher were properly classified.

Moreover, the unrefuted testimony was that Goldfarb did consider the Section 8 applicants' option to seek to pay an additional 10% of their incomes. Goldfarb, in fact, added 10% of the Section 8 applicants' income to the rent limits of their vouchers in reviewing their applications and advised Section 8 applicants whose vouchers were insufficient that they had the option of asking permission to pay more. R. JA-1455 ¶¶ 24-25; R. JA-1443 ¶ 18. There was thus no evidence that any

28

applicants were denied without Goldfarb's doing what it could to assist the applicants to take advantage of this option. Dr. Steil's testimony that this option might have been available to some of the Section 8 voucher holders was mere speculation as to any effect it might have had on the approval and denial statistics relating to partial voucher holders.

For these reasons, Dr. Steil failed to rebut Goldfarb's showing that its insufficient voucher statistics were valid and that the 2019 Policy had no adverse disparate effect on partial voucher holders. The Court below committed clear error in adopting the view that applicants who applied for apartments with vouchers that would not be valid for the apartments they applied for should be considered as applicants adversely affected by Goldfarb's 2019 Policy.

### B. No Contact Applicants

"No contact" applicants were applicants who stopped responding to Goldfarb's communications during the application process. It is apparent that applicants who dropped out of the application process, which was not a different process for voucher or non-voucher applicants, were not adversely affected by Goldfarb's 2019 Policy.

An applicant who stops communicating with Goldfarb during the application process is not adversely affected by the 2019 Policy or discriminated against on grounds of source of income. Indeed, such an applicant is not even denied by

Goldfarb, but rather has simply voluntarily dropped out of the application process. Nevertheless, in his Tables 24, 25 and 26, Dr. Steil counted these applicants as applicants rejected by Goldfarb's 2019 Policy. See R. JA-1155-1156.

Even though no-contact applicants voluntarily dropped out of the process, the Court below concluded that no contact applicants should be counted as applicants adversely affected by Goldfarb's 2019 Policy. R. JA-1623; R. SPA-32. As with insufficient voucher applicants, the Court's stated reason for including no contact applicants in the analysis was entirely statistical: "Perhaps most importantly, according to the data, applicants with subsidies are rejected for 'no contact' 30% of the time, while applicants with no subsidy are rejected for no contact 14% of the time." R. JA-1624; R. SPA-33.

However, there was no evidence of differential treatment of voucher and non-voucher applicants. See R. JA-330 ¶ 20, R. JA-165 ¶ 5, See R. JA-334 ¶ 20, R. JA-335 ¶ 17; R. JA-388 ¶ 4, R. JA-389 ¶ 2. There was no evidence to show that the voucher applicants who were counted as no contact applicants had in fact responded to Goldfarb's communications during the application process. Hence, there was nothing to cast doubt on Dr. White's statistics excluding no contact applicants – voucher and non-voucher – from the adverse effect analysis.

A mere statistical difference between a protected group and the rest of the population is insufficient as a matter of law to raise an inference of adverse disparate

30

impact. There must be "robust causation" between some aspect of the policy at issue and the statistical difference. In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project*, 576 U.S. 519, 542, 545–46 (2015), the Supreme Court held that disparate impact claims are cognizable under the Fair Housing Act but explained that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity."

Here there is no Goldfarb policy to which FHJC pointed to that caused the no-contact statistical difference. While the Court observed that Goldfarb's leasing agents had discretion as to when and how to contact applicants and that this "raises the question" why there was a statistical difference (R. JA-1624; R. SPA-33), there was no evidence that Goldfarb treated voucher applicants differently from non-voucher applicants. Hence, the inference that the Court drew that somehow Goldfarb caused more voucher holders to cease communicating with Goldfarb was statistical alone and no inference can be drawn from it.

To the extent that the Court assumed that Goldfarb had any obligation to pursue applicants who did not respond to Goldfarb's communications, it imposed on Goldfarb an obligation going beyond non-discrimination. The law forbids discrimination. It does not impose affirmative obligations to pursue subsidized applicants.

31

Additionally, while FHJC employed "testers", whose job it was to imitate applicants for apartments to see how Goldfarb treated subsidized applicants, no evidence was offered from any "testers" to show that Goldfarb discriminated against subsidized applicants as to how, when or how often or how diligently Goldfarb contacted subsidized applicants.

Apart from testers, FHJC also had access to the names and contact information of Goldfarb's applicants. As set forth above, FHJC produced one such applicant, Kianna Glanton, as an unsuccessful rebuttal witness, in which the Court determined that Goldfarb properly rejected her "insufficient application." R. JA-1638; R. SPA-47. FHJC did not produce any other applicants to testify that they responded to Goldfarb's communications but were nevertheless rejected for non-responsiveness.

For these reasons, the District Court committed clear error in adopting the view that applicants who stopped communicating with Goldfarb during the application process should be considered as applicants discriminatorily denied by Goldfarb's otherwise lawful 2019 application Policy.

**III.  THE DISTRICT COURT ERRED IN FINDING A DISPARATE ADVERSE EFFECT ON ONLY A SUBGROUP OF RENT SUBSIDIZED APPLICANTS CONTRARY TO ESTABLISHED SECOND CIRCUIT PRECEDENT**

As demonstrated above, no adverse disparate effect was either proved or claimed on all voucher holders as a group. Instead, FHJC had to separate out a

32

subgroup of partial voucher holders in an attempt to show an adverse disparate effect.

The Court's reliance on Dr. Steil's analysis, however, using a subgroup approach is inconsistent with controlling law in this Circuit. The Second Circuit has rejected claims of disparate impact based upon subgroups of a protected class because the fundamental notion of disparate impact is that the neutral policy has an adverse effect on a protected class as a whole, not an arbitrary subset of the protected class. *See, Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999) ("In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset."); *Criley v. Delta Airlines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (affirming summary judgment in favor of defendant where plaintiffs acknowledged that the policy at issue had "no negative impact" on the entire protected group).

The disparate impact must affect the entire protected class, not just a subgroup of the protected class. *See Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989) ("Appellants in effect ask us to expand the disparate impact approach so as to include recognition of 'sub-groups' … We find no support in the case law or in the ADEA for the approach to disparate impact analysis appellants

33

advocate."); *Wharff v. State Univ. of New York*, 413 Fed. Appx. 406, 409 (2d Cir. 2011) (quoting *Xerox* and rejecting plaintiff's selection of a subgroup of 10 supervisors eligible for promotion out of a group of 18); *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 386 (S.D.N.Y. 2009) ("[d]isparate impact claims concern the entire population affected by the identified practice, not merely the subset of affected laborers who happen to have brought suit"); *Eidinger v. PRIMMA, LLC*, 2022 WL 17685444, at *7 (E.D.N.Y. Nov. 1, 2022) ("a so-called "sub-group" disparate impact claim …is not cognizable in the Second Circuit," rejecting claim based on over-60 employees alone, rather than all employees over 40).

If identifying any subgroup of unsuccessful subsidized applicants were enough to condemn a landlord's application requirements, it is easy to see that all such requirements would fall. That is simply not the law.

It is also not the law that a landlord's requirement that happens to disqualify some subsidized persons from renting the landlord's apartments creates an unlawful disparate impact based on source of income. FHJC's position would completely preclude landlords from selecting or screening their tenants, since some identifiable group of subsidized applicants would be disqualified by any realistic requirement. As the Second Circuit said in *Tsombanidis v. West Haven Fire Dept.*, 352 F.3d 565, 576 (2d Cir. 2003), rejecting the District Court's disparate impact analysis, "The

court's analysis would appear to apply to *any* facially neutral housing policy that prevents a handicapped person from living in a particular house." (emphasis added); *see also, Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d Cir. 1999) ("In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset."); *accord, Darensburg v. Metropolitan Transp. Comm.*, 636 F.3d 511, 520 (9th Cir. 2011) (quoting *Smith*). "The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy."; *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F. Supp.2d 1, 16 (D.D.C. 2004) ("Moreover, if an expert isolates units or groups and runs separate analyses for them, such methodology may mask whether "the overall decision-making process" produces a discriminatory result, whereas analyzing an entire group will indicate whether the identified employment practice was the cause of the disparity.")

The subgroup method employed by Dr. Steil here is similar to that used by the plaintiffs and rejected by the Second Circuit in *Smith v. Xerox*, *supra*. In *Xerox*, a group of plaintiffs alleged that Xerox's decision-making process for reducing its work force had a disparate impact based on age. *Xerox*, 196 F.3d at 363, 364-365.

35

Plaintiffs' expert did an analysis based only upon the work units that the plaintiffs had been laid off from, sometimes combining work units to create a larger pool, and opined that there was an adverse disparate impact based upon age. *Xerox*, 196 F.3d at 366-67. The Second Circuit rejected that analysis, granting the defendant summary judgment due to the improper subgroup analysis. The Court explained its rejection of the subgroups as follows:

> In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset….

*Xerox,* 196 F.3d at 369. *accord, Darensburg v. Metropolitan Transp. Comm*., 636 F.3d 511, 520 (9th Cir. 2011) (quoting *Tsombanidis*) ("The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy."); *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F. Supp. 2d 1, 16 (D.D.C. 2004) ("Moreover, if an expert isolates units or groups and runs separate analyses for them, such methodology may mask whether "the overall decision-making process" produces a discriminatory result, whereas analyzing an entire group will indicate whether the identified employment practice was the cause of the disparity.")

36

Neither FHJC nor Dr. Steil identified any principled difference between full subsidy holders and partial subsidy holders for purposes of determining whether government subsidy holders had suffered a disparate adverse effect. Neither FHJC nor Dr. Steil identified any principled difference between subsidy holders in the Section 8, HASA and Olmstead programs and the SOTA, FHEPS and City/FHEPS programs for the same purpose. These distinctions should be rejected.

For these reasons, the District Court erred in accepting Dr. Steil's approach, looking only at applicants partially subsidized by three selected government programs, instead of Dr. White's analysis, which looked at all government rent subsidies.

## **CONCLUSION**

For the foregoing reasons, defendants respectfully submit that the Judgment of the District Court should be reversed insofar as it finds defendants liable for discrimination based on source of income in their otherwise lawful 2019 application policy, which remains their current policy, and grants injunctive and other prospective relief. Defendants should be granted judgment on their counterclaim for a declaratory judgment that their 2019 tenant application policy is lawful, and the case should be remanded to the District Court for reconsideration of its award of punitive damages.

Dated:     February 2, 2024
           New York, New York

                        MOSES & SINGER LLP

                        By:   /s/David Rabinowitz
                        Robert Wolf
                        David Rabinowitz
                        405 Lexington Avenue
                        New York, New York 10174
                        (212) 554-7800
                        rwolf@mosessinger.com
                        drabinowitz@mosessinger.com

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because this brief contains 8,204 words, excluding the parts of the brief exempted by Fed. R. App. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. 32(a)(6) because this brief has been prepared in proportionally-spaced typeface using Microsoft Word in Times New Roman, Font Size 14.

Dated: February 2, 2024

# SPECIAL APPENDIX

i

# Table of Contents

**Page**

Judgment of The United States District Court for the
   Southern District of New York, Dated September 29, 2023,
   Appealed From........................................................................SPA-1

Order of Honorable Edgardo Ramos,
   Dated September 29, 2023, Appealed From ...........................SPA-2

Opinion and Order of Honorable Edgardo Ramos,
   Dated September 29, 2023 .......................................................SPA-9

SPA-1

Case 1:18-cv-01564-ER   Document 174   Filed 09/29/23   Page 1 of 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
FAIR HOUSING JUSTICE CENTER, INC.,
                                        Plaintiff,
            -against-

PELICAN MANAGEMENT, INC., FORDHAM
ONE COMPANY, LLC, and CEDAR TWO
COMPANY, LLC,
                                        Defendants.
------------------------------------------------------------------X
PELICAN MANAGEMENT, INC., FORDHAM
ONE COMPANY, LLC, and CEDAR TWO
COMPANY, LLC,
                                        Counterclaimants,

            -against-

FAIR HOUSING JUSTICE CENTER, INC.,
                                        Counterclaim-Defendant.
------------------------------------------------------------------X

18 **CIVIL** 1564 (ER)(OTW)

**JUDGMENT**

            It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion & Order dated September 29, 2023, the Court finds for the FHJC on

each of its claims under the FHA and NYCHRL. The Court also finds that the 2019 Policy is not

lawful, but only as to the partial subsidy requirements. The Court awards FHJC $240,540 in

compensatory damages and $750,000 in punitive damages. Accordingly, the case is closed.

**Dated:**  New York, New York
            September 29, 2023

                                        **RUBY J. KRAJICK**
                                        **Clerk of Court**

                        **BY:**

                                        _____
                                        **Deputy Clerk**

SPA-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FAIR HOUSING JUSTICE CENTER, INC.,

Plaintiff,

– *against* –

PELICAN MANAGEMENT, INC., FORDHAM
ONE COMPANY, LLC, *and* CEDAR TWO
COMPANY, LLC,

Defendants.

**ORDER**

18-cv-1564 (ER) (OTW)

PELICAN MANAGEMENT, INC., FORDHAM
ONE COMPANY, LLC, *and* CEDAR TWO
COMPANY, LLC,

Counterclaimants,

– *against* –

FAIR HOUSING JUSTICE CENTER, INC.,

Counterclaim-Defendant.

RAMOS, D.J.:

## I.  GENERAL INJUNCTION

1.  Defendants and their employees and managing agents who are leasing, managing, or

otherwise providing related property management services for rental buildings located in

New York City and Westchester County at the present time or at any time for the duration of

this injunction are hereby enjoined from discriminating against any person on the basis of

disability in violation of the federal Fair Housing Act, 42 U.S.C. § 3601 et seq. (the "FHA");

and on the basis of disability and lawful source of income, including rental subsidies and

SPA-3

vouchers, in violation of the New York City Human Rights Law, New York Administrative Code, § 8-107 et seq., in any manner, including without limitation:

    a.  Denying or withholding rental apartments, or otherwise making rental apartments unavailable on the basis of disability or lawful source of income, including by applying minimum income requirements to applicants with rental subsidies or vouchers;

    b.  Discriminating against applicants with rental subsidies or vouchers in the terms or conditions of the rental process because of disability or source of income, including by offering variances and waivers to rental criteria to non-subsidy applicants and not to subsidy applicants, and requiring rejected applicants to wait a minimum period of time before reapplying for apartments to rent; and

    c.  Coercing, intimidating, threatening, or interfering with any person, including Plaintiff, on account of having aided or encouraged any other person in the exercise or enjoyment of any rights granted or protected by the Fair Housing Act and the New York City Human Rights Law.

## II.  NON-DISCRIMINATION POLICIES

Unless stated otherwise to the contrary, the following provisions shall go into effect within thirty (30) days of the date of this Order:

2.  Defendant Pelican Management, Inc. ("Goldfarb Properties") shall adopt and utilize written non-discriminatory rental criteria that does not include:  a) minimum gross or net income requirements, including net rent-to-income ratios for applicants with partial pay or 100% pay rental subsidies or vouchers and b) minimum time periods for rejected applicants to reapply.

SPA-4

3.  Goldfarb Properties shall develop written procedures for processing applications that incorporate these non-discriminatory rental criteria and distribute them to all leasing agents and managers by email.

4.  Goldfarb Properties shall adopt a written equal housing opportunity policy that prohibits housing discrimination in violation of the federal Fair Housing Act, the New York State Human Rights Law, and the New York City Human Rights Law by its employees and agents who are involved in providing information about apartments for rent to the public, including on the company's website; providing information about the company's rental application process, including communicating with applicants and prospective applicants about the process; evaluating rental applications submitted to the company; and/or otherwise developing and applying the company's rental criteria.  The policy shall include a list of all protected characteristics covered by these laws, including disability and lawful source of income.

5.  Goldfarb Properties shall provide Plaintiff FHJC with a copy of the non-discrimination policy within ten (10) days of its adoption and dissemination to the Goldfarb Properties employees and agents described in Paragraph 4.

6.  Goldfarb Properties shall post its non-discrimination policy on its website and distribute the policy by email to the Goldfarb Properties employees and agents described in Paragraph 4.

7.  Goldfarb Properties shall post and prominently display a full-size Department of Housing and Urban Development (HUD) fair housing poster (HUD Form 928.1) and a full-size New York City Commission on Human Rights housing discrimination poster, in a conspicuous location at each business office that is open to the public.  The signs shall be displayed where

3

SPA-5

they are plainly visible to members of the public who may inquire about apartments for rent at each office.

8. Goldfarb Properties shall include the HUD Equal Housing Opportunity logo with the words "Equal Housing Opportunity" in a readable and legible manner on all residential rental advertising placed by Goldfarb Properties or at its direction, including on-line advertising on third-party websites.  Goldfarb Properties shall also include the logo on the home page of its website.

9. Goldfarb Properties shall include the following sentences in a readable, legible, and visible manner on the website page containing its on-line rental application form: "We are an equal housing opportunity provider.  We do not discriminate because of race, color, religion, sex or gender, national origin, familial status, disability, marital status, domestic partnership status, age, sexual orientation, gender identity, alienage or citizenship status, lawful occupation, military status, status as a survivor of domestic violence, or lawful source of income, including housing subsidies and vouchers."

### III.  FAIR HOUSING TRAINING

10. Within ninety (90) days of the date of this Order, Goldfarb Properties shall, at its own expense, contract with a third party to provide the following fair housing training program. The third party may not be a current or former employee, agent, or attorney of any of Defendants.  The training shall last at least three hours and be offered "live," not as an on-line pre-recorded program; the training may be held virtually.  The training shall include informing individuals of their duties and obligations under a) this Order, b) the Defendants' equal housing opportunity policy; and c) the requirements of the federal Fair Housing Act, 42

SPA-6

U.S.C. § 3601 et seq. (the "FHA"), the New York State Human Rights Law, and the New York City Human Rights Law, New York Administrative Code, § 8-107 et seq.

11. The persons required to attend the training described above shall include the owners of the Defendant corporations, Defendants' employees whose job duties relate to the rental of apartments and evaluation of rental applications, including leasing agents, general managers, regional managers, employees working in the credit and legal departments, and those who draft and/or place advertisements or rental listings for Defendants.

12. Each person who attends the training described above shall sign a certification indicating that he or she has received, read, and understood Goldfarb Properties' equal housing opportunity policy and has attended the training.

13. Within thirty (30) days of commencing employment with Pelican Management, each new employee with job duties related to leasing apartments, shall be given a copy of Goldfarb Properties' equal housing opportunity policy and be required to sign a certification indicating that he or she has received, read, and understood the policy.

14. Once per year for the length of this Order, each of Goldfarb Properties' employees with job duties related to the leasing of apartments who has been newly retained within the preceding one-year period, shall attend the fair housing training program described above and conducted by a third-party. The trainer may not be a current or former employee, agent, or attorney of any of Defendants and the training program shall conform to the requirements described above for the initial training.

15. Defendants shall retain all training verifications signed by trainees for the length of this Order and provide copies to Plaintiff FHJC upon request but no more than one time per calendar year.

SPA-7

## IV.  RECORDKEEPING AND REPORTING REQUIREMENTS

16. Defendants shall maintain sufficient records to verify compliance with the terms of this Order and shall make such records available to Plaintiff FHJC to review and copy upon request and reasonable notice but no more than one time per calendar year.  Applicable records shall include documents reflecting Defendants' advertising on third-party websites, apartment listings posted by Defendants on the Goldfarb Properties' website, applications and supplemental information such as proof of rental subsidy and sources of income, documents used to evaluate rental applications (qualification calculators, background checks, and other similar worksheets and information), rental decision letters sent to applicants, rental criteria and policies, and employee training.  Defendants may redact personal, financial, and medical information of third-party applicants for apartments from the records produced to FHJC.  FHJC shall keep confidential all such records received unless filing a motion with the Court for compliance under this Order, and in that event, must file such records under seal, and destroy such records at the end of the term of this Order.

SPA-8

## V.  TERM AND ADMINISTRATION OF ORDER

17. Defendants shall be bound by this injunction for a period of five (5) years from the date of entry of this Order.

18. The Southern District of New York shall retain jurisdiction to enforce the terms of this Order upon the filing of an appropriate motion by Plaintiff FHJC.

19. Prior to filing any such motion, FHJC shall provide a written notice to Defendants describing any alleged violations of this Order.  Defendants shall then have thirty (30) days to cure.

Dated:  New York, New York
       September 29, 2023

SO ORDERED:

_____
Edgardo Ramos
United States District Judge

SPA-9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FAIR HOUSING JUSTICE CENTER, INC.,

Plaintiff,

– against –

PELICAN MANAGEMENT, INC.,
FORDHAM ONE COMPANY, LLC, *and*
CEDAR TWO COMPANY, LLC,

Defendants.

PELICAN MANAGEMENT, INC.,
FORDHAM ONE COMPANY, LLC, *and*
CEDAR TWO COMPANY, LLC,

Counterclaimants,

– against –

FAIR HOUSING JUSTICE CENTER, INC.,

Counterclaim-Defendant.

<u>OPINION & ORDER</u>

18-cv-1564 (ER) (OTW)

<u>RAMOS, D.J.</u>:

The Fair Housing Justice Center, Inc. ("FHJC") brought this action alleging that

Pelican Management, Inc., Fordham One Company, LLC, and Cedar Two Company, LLC

(collectively "Defendants"), owners of rental buildings in New York City, adopted a

minimum income requirement for prospective renters in the fall of 2015 that was

unlawful under both the Fair Housing Act (the "FHA") and New York City Human

Rights Law ("NYCHRL").  Specifically, Defendants' minimum income policy at that

time required that all prospective renters earn an annual income of at least 43 times their

total monthly rent.  According to FHJC, that policy excluded virtually all renters who

received rental subsidies, a large percentage of whom have disabilities.  In January of

SPA-10

2019, Defendants adopted a new minimum income policy and thereafter asserted a counterclaim seeking a declaratory judgment that this new policy is lawful. A bench trial was conducted by this Court on February 7, 2022.[1] This Opinion constitutes the Court's findings of fact and conclusions of law on whether Defendants' 2015 Policy was unlawful and whether the 2019 Policy is lawful and an adequate remedy. For the reasons set forth below, the Court finds for FHJC on each of its claims under the FHA and NYCHRL, and finds that the 2019 Policy is unlawful.

I.   **BACKGROUND**

FHJC filed this action on February 21, 2018 alleging that Defendants' 2015 Policy (the "2015 Policy") requiring that all prospective renters in their buildings earn an annual income of at least 43 times their total monthly rent was unlawful under the FHA and NYCHRL.[2] Doc. 1. FHJC asserts that the 2015 Policy had a substantial adverse disparate impact on renters using one of three rental subsidies—the Olmstead Housing Subsidy ("OHS"), the New York City HIV/AIDS Services Administration ("HASA") rental subsidy, and Section 8 or Housing Choice Vouchers.[3] Doc. 86 ¶¶ 83–88.

On April 23, 2018, the Defendants moved to dismiss the complaint. Doc. 25. On May 21, 2018, Judge Forrest, to whom the case was originally assigned, granted FHJC leave to file an amended complaint without ruling on Defendants' motion. Doc. 34. In January 2019, nearly eleven months after the instant action was filed, Defendants adopted a new minimum income policy (the "2019 Policy").

---

[1] The bench trial began on February 7, 2022 and was adjourned the next day. The trial continued on October 27, 2022 and was concluded on October 28, 2022.

[2] The complaint was originally filed by both FHJC and an individual named Alfred Spooner. On May 2, 2019, the parties filed a stipulation of dismissal of all claims by Spooner with prejudice. *See* Doc. 75. The original complaint was against Cedar Two Company, LLC., Deegan Two Company, and Goldfarb Properties, Inc. Deegan Two Company and Goldfarb Properties, Inc., were replaced by Pelican Management, Inc. and Fordham One Company in the second amended complaint. Doc. 86.

[3] The terms "subsidies" and "vouchers" are used interchangeably herein.

SPA-11

On July 2, 2019, the parties stipulated to the filing of a second amended complaint ("SAC").  Doc. 85.  On July 23, 2019, nine days after they were served with the SAC, Defendants filed an answer and asserted the counterclaim at issue here, in which they sought a declaration that the 2019 Policy is lawful.  Doc. 94.  On October 15, 2019, FHJC moved to dismiss that counterclaim.  Doc. 107.  The motion was denied on July 24, 2020, with the Court finding that Defendants' counterclaim was properly and timely asserted in response to the amended complaint, did not unduly expand the instant action or prejudice FHJC, and was ripe under the Declaratory Judgment Act.  *Fair Hous. Just. Ctr., Inc. v. Pelican Mgmt., Inc.*, No. 18 Civ. 1564 (ER), 2020 WL 4262291, at *5 (S.D.N.Y. July 24, 2020).

The Court commenced a bench trial on February 7, 2022.  The bench trial continued on February 8, 2022 and adjourned the next day due to the unavailability of two witnesses.  The trial continued on October 27, 2022 and concluded on October 28, 2022.  The following witnesses were called by FHJC in person or by affidavit:

- Shaye Belcon, FHJC's investigative coordinator at the time of its investigation into Defendants' policies;

- Kate Haggerty, an FHJC tester who posed as a potential renter to determine whether Defendants were engaging in housing discrimination;

- Lisa Darden, an FHJC tester who posed as a potential renter to determine whether Defendants were engaging in housing discrimination;

- Cathy Bowman, Director of the LGBTQ & HIV Advocacy Project at Brooklyn Legal Services with knowledge of the creation and administration of the HASA rental subsidy program;

- Trevor Schaper, Defendants' Vice-President of Operations;

- Christopher Miller, Defendants' Leasing Manager;

- Richard Dunn, the head of Defendants' credit department;

3

- Inga Ballard, an FHJC tester who conducted a test of Defendants' rental policies;

- Philip Goldfarb, one of Defendants' owners;

- Fred Freiberg, the Executive Director of FHJC at the time of FHJC's investigation into Defendants' rental policies;

- Dr. Justin Steil, Associate Professor of Law and Urban Planning at the Massachusetts Institute of Technology, was called by FHJC as its expert;

- Kiana Glanton, a vision impaired woman who submitted a rental application for one of Defendants' properties using a Section 8 voucher;

- Alicia Suggs, a friend of Kiana Glanton who served as a guarantor in Glanton's rental application.

The following witness was called by Defendants:

- Dr. Paul White, a Partner at Resolution Economics, LLC, was called as an expert.

At the conclusion of the bench trial, the Court directed the parties to submit proposed findings of fact and conclusions of law.

## II.     FACTS

### A.  Undisputed Facts

FHJC is a non-profit organization in New York City whose mission is "to ensure that all people have equal access to housing opportunities in the New York City Region by eliminating housing discrimination; promoting policies and programs that foster open, accessible, and inclusive communities; and strengthening enforcement of fair housing laws." Plaintiff's Proposed Finding of Facts and Law ¶ 3. Among other things, FHJC conducts tests and other investigations of allegations of housing discrimination. Freiberg Aff., Pl. Ex. 68 ¶ 10. FHJC utilizes testers to pose as potential renters or homebuyers to determine whether illegal housing discrimination is taking place. *Id.* ¶ 12.

### a. OHS, HASA, and Section 8 Subsidies

OHS helps to ensure safe and sustainable housing in the community for "high need" Medicaid beneficiaries who have become homeless or have been placed in nursing homes as a result of their disability. Defs. Ex. Q ¶ 21. OHS is a partial subsidy, and for the most part, OHS recipients are required to pay 30% of their income towards rent with OHS providing a direct payment each month to the landlord to pay the balance. *Id.* ¶ 22; Pl. Ex. 29. In order to qualify for OHS, an applicant must have a disability. Accordingly, all OHS recipients are disabled under the FHA.

HASA provides public benefits and services for people living with HIV/AIDS in New York City. All HASA clients are automatically eligible for a rent allowance above the standard public assistance levels. Pl. Ex. 66 ¶ 7. Because all HASA recipients are living with Symptomatic HIV, all recipients are disabled under the FHA. Steil Aff., Pl. Ex. 70 ¶ 53; *see also* Handicap definition, 24 C.F.R. § 100.201. A HASA subsidy can be for part or all of the rent. Pl. Ex. 66 ¶ 15.

Section 8 is a partial subsidy and the most commonly used voucher program in New York City. Steil Testimony, 10/28/2022 Tr. 190:12–17. Section 8 recipients are eligible to rent apartments using their vouchers up to the payment standard, the maximum amount of subsidy the program will pay to the owner on behalf of a voucher holder, with the tenant paying 30% of his or her income toward rent and Section 8 paying the balance. If a voucher recipient wants to rent an apartment with a rent greater than the payment standard, they may be permitted to do so as long as their share of the rent is no more than 40% of their adjusted gross income. Steil Aff., Pl. Ex. 70 ¶ 37.

### b. *Defendants and the Test Calls*

Defendant Pelican Management manages multi-family residential buildings with approximately five to six thousand rental units in New York City and Westchester County, New York. 10/27/2022 Tr. at 64:15–19, 84:11–14, 101:17–20. Pelican Management's public-facing name is Goldfarb Properties ("Goldfarb"), *id.* at 63:25–64:04, and Philip Goldfarb is its owner. *Id.* at 59:9–18. Defendants Fordham One Company, LLC, and Cedar Two Company, LLC, each own one rental building in which Philip Goldfarb has an ownership interest. *Id.* at 97:19–98:1, 98:24–99:6.

The buildings owned by these two defendants had apartments available for rent that Alfred Spooner, who was an original plaintiff in this case with FHJC, applied to rent in 2017. Pl. Ex. 40. At the time, Spooner held an OHS subsidy. The OHS subsidy guarantees that eligible individuals pay only 30% of their monthly income towards rent with the balance paid by OHS. Defs. Ex. Q ¶ 22. The apartment he applied to had a monthly rent of $1,384. Pl. Exs. 40, 41. His application was rejected under Goldfarb's 2015 Policy for "insufficient income." Pl. Ex. 44; 2/7/2022 Tr. at 143:06-09. Under the 2015 Policy, all applicants who were rejected had to wait at least 60 days before they could apply again to rent an apartment. Defs. Ex. A; 2/7/2022 Tr. at 91:14–25.

Upon receiving a complaint from Spooner, FHJC conducted four telephone tests to investigate his claim. *Id.* ¶¶ 18–19. The first test was conducted on August 17, 2017. During this test, a tester named Kate Haggerty called Goldfarb's Far Rockaway, Queens Office and posed as the daughter of an OHS recipient. Pl. Ex. 59 ¶ 34; Pl. Ex. 60 ¶¶ 4–26; Pl. Ex. 19. Haggerty conducted a second test on August 17 and 22, 2017. During this test, Haggerty called Goldfarb's New Rochelle, New York office and again posed as the daughter of an OHS recipient. Pl. Ex. 59 ¶ 35; Pl. Ex. 60 ¶¶ 25–41; Pl. Ex. 20. The

third test was conducted on September 13, 2017. During this test, a tester named Inga Ballard posed as a tenant with a Section 8 voucher. Pl. Ex. 59 ¶ 36; Pl. Ex. 21. The fourth test was conducted on October 13, 16, and 17, 2017. During this test, a tester named Lisa Darden called Goldfarb Properties' Far Rockaway, Queens Office and posed as the sister of a recipient of a HASA rental subsidy. Pl. Ex. 59 ¶ 37; Pl. Ex. 61 ¶¶ 4–50; Pl. Ex. 22.

During all four tests, the Goldfarb staff confirmed their policy of requiring that all applicants earn 43 times the total rent in income, even if the applicant had a subsidy that would pay part of the rent or, in the case of HASA, the entire rent. The testers explained to Goldfarb employees how these subsidies worked, that the government would be paying large portions of the rent, and, most importantly, that it would be impossible to have an income low enough to receive a subsidy but high enough to satisfy the 43-times-the-rent requirement. In all instances, Goldfarb staff indicated that they understood these concerns, but that company policy was to apply these income tests to all applicants even if they had a rental subsidy. *See generally* Pl. Exs. 60, 61, 67, 20–22.

### 2. *2015 Policy*

In 2015, Goldfarb was experiencing an unusually high rates of tenant rent arrears. In response, Miller, Defendants' Leasing Manager, and Schaper, Defendants' Vice-President of Operations, created a company-wide policy establishing income and credit requirements for rental applicants.[4] Goldfarb Testimony, 10/27/2022 Tr. at 82:13–15, 85:4–86:21. This new policy went into effect shortly after Goldfarb reached a settlement

---

[4] Lawyers Michael Koenig and Hal Weiner also assisted in drafting the 2015 Policy.

SPA-16

in another housing discrimination case that had been filed against it.[5] *Goode v. Goldfarb Properties, Inc.,* No. 7913/2015 (N.Y. Sup. Ct.).  In that settlement Goldfarb agreed to not discriminate against prospective renters on the basis of lawful source of income.  *See* Schaper Testimony, 2/7/2022 Tr. at 58:22–59:4.

The 2015 Policy included the following requirements for applicants:  (1) a credit rating of 650 or higher; (2) gross annual income equal to 43 times the monthly rent; and (3) a monthly net rent-to-income ratio of no more than 40%, that is to say, the tenant could not pay more than 40% of their net income in rent.[6] *See* Defs. Ex. A; Defs. Ex. UU ¶¶ 17–18.  The second and third requirements applied to rental applicants with subsidies even if the applicant would only be personally responsible for a small portion of the rent, or no rent at all.  2/27/2022 Tr. at 50:09–52:02, 53:15–18, 58:07–21, 110:04–21.

When Defendants performed this calculation, it treated voucher payments toward rent as though it were cash income.  For example, if an applicant were applying for a $1,000 apartment and had no income, but received a subsidy that would pay the full rent, Defendants would treat that applicant as earning $12,000 in income (12 monthly payments of $1,000).  This applicant would be rejected, however, because Defendants' policy required that applicant to earn $43,000 in income, 43 times the monthly rent. 2/7/2022 Tr. at 58:07–21.

Defendants used a software program called Yardi to process applications.  Yardi had a feature that required applicants to answer pre-set questions, including whether the

---

[5] The plaintiff in that case, Goode, was a HASA recipient who was expressly told by a Goldfarb staff member that the company did not accept HASA subsidies.  *Goode* Complaint, Pl. Ex. 26 ¶ 20.  This was later confirmed in a FHJC test call.  *Id.* ¶ 27.

[6] All applicants were also required to have good rental history, pass a criminal background check, and "be at current job for at least 3 months."  Defs. Ex. A.

SPA-17

applicant has a housing subsidy.  Defendants chose not to activate this feature when the 2015 Policy was in effect.  Accordingly, Defendants had no consistent way to determine whether an applicant had a rental subsidy unless an applicant listed it as an "additional source of income."  2/7/2022 Tr. at 144:16–146:02, 171:19–172:2.

The individuals in charge of reviewing the rental applications during this time were Schaper, Miller, and Dunn (the head of Defendants' credit department).  *Id.* at 65:04–20.  Schaper attended a Fair Housing training in 2015 and 2017 conducted by Kevin Cremin, a trainer and former Department of Justice Civil Rights Division attorney.[7]  Schaper testified that he reviewed the materials distributed at the training sessions, which included as an example of unlawful source-of-income discrimination a policy requiring that "even if you have Section 8, you must make three times the rent." *Id.* at 61:14–20, 64:20–65:03; *see also* Pl. Exs. 57, 58.  Goldfarb also sent an online Fair Housing training course to all of its employees.  The course included a test at the end of the training.  2/7/2022 Tr. at 60:9–13.  Miller testified that he never consulted these materials when developing the 2015 Policy.  *Id.* at 109:13–16.

Applications that did not include a subsidy were assessed by Miller until Dunn was hired in 2016, at which point Dunn reviewed all such applications.  Schaper and Miller would review all applications that did include a subsidy and had the sole authority to decide whether to accept or reject the applicants.  *Id.* at 65:04–16, 65:23–25, 110:22–111:02.

---

[7] Defendants' employees were required to participate in this training as part of the settlement reached in the *Goode* matter.

Dunn testified that it was his "regular practice" to apply a 5% variance to Defendants' 40% net rent-to-income ratio requirement when reviewing applications that did not include a subsidy.  That is, notwithstanding the Policy, Dunn would approve applicants with no subsidy who met Defendants' other requirements so long as they had a net rent-to-income ratio of 45% or lower.  10/27/2022 Tr. at 45:14–46:01.  Moreover, Dunn also testified that he would often approve applicants who had a good rental payment history even if they did not meet Goldfarb's income requirements.  *Id.* at 48:14–49:13, 49:20–50:24, 53:12–15.

Schaper and Miller, on the other hand, testified that they were "fairly rigid" in applying the 40% net rent-to-income ratio requirement, and only provided exceptions under limited circumstances, such as when the applicant had exceptional credit, significant savings, or a guarantor.  2/7/2022 Tr. at 72:12–18, 95:13–18, 104:06–09, 117:24–119:07.  Unlike Dunn, Schaper and Miller did not consider the rental payment history for applications that included a subsidy.  *Id.* at 123:24–125:01, 126:03–07.  In other words, Defendants were more forgiving in reviewing the applications of those applicants who did *not* have a subsidy, versus those that *did* have a subsidy.

### 3.  2019 Policy

In May 2019, Goldfarb announced the new criteria for its 2019 Policy on its website and to its staff.[8]  For applicants with no subsidy, the criteria was unchanged.[9]

---

[8] Defendants assert that they began applying the new policy to applications in January 2019, but acknowledge that there is no record of the 2019 Policy being applied between January and May 2019. 2/7/2022 Tr. at 150:12–20, 153:17–154:02; Pl. Ex. 55.

[9] The criteria includes a satisfactory credit history, proof of source of income, a gross annual income of at least 43 times the monthly rent, a rent-to-net income ratio of no more than 40%, good rental history, having been employed at least 3 months if income from employment is required to satisfy the rent to net income ratio, and an acceptable criminal history (date and offense are factors). Pl. Ex. 31.

*See* 2019 Policy, Pl. Ex. 31. Additionally, the 60-day waiting period to reapply after an initial denial remained in place for all applicants under the 2019 Policy. Miller testified that Goldfarb made exceptions to the 60-day rule for both applicants with and without subsidies from time to time. 2/7/2022 Tr. 180:1–7.

### a.  *Applicants with a Partial Subsidy*

Under the 2019 Policy, applicants with partial subsidies must meet all of the requirements as unsubsidized applicants, except they must earn 40 times the rent in income instead of 43 times as under the 2015 Policy. Partial subsidy applicants must still have a rent-to-income ratio of no greater than 40%. Instead of using the full rent amount for these calculations, however, Goldfarb uses the portion of the rent for which the applicant is responsible (rent minus voucher amount) when assessing an applicant's financial eligibility. 2/7/2022 Tr. at 155:01–15.

### b.  *Applicants with a Full Subsidy*

The only criteria for applicants with full subsidies are: having an acceptable criminal history,[10] producing all sources of verifiable income, and confirming that the first month's rent and security deposit will be tendered at lease execution. Under the 2019 Policy, Goldfarb no longer applies an income test for applicants with full subsidies. Pl. Ex. 31; 2/7/2022 Tr. at 154:23–25.

For Section 8 recipients, Goldfarb did not use the adjusted gross income formula, and instead calculated the adjusted gross income of an applicant with a partial subsidy by looking at their net income and deducting any taxes payable. Miller Testimony, 2/7/2022 Tr. at 161:23–25. The Section 8 program adjusts applicants' gross income based on a

---

[10] As mentioned above, having an "acceptable criminal history" is a requirement for all applicants.

number of deductions, including those for dependents, child care, disability assistance, unreimbursed medical expenses, and if there are elderly or disabled family members in the household. *See* Adjusted Income Mandatory Deductions, 24 C.F.R. § 5.611(a). The effect of these deductions is that the tenant's rent share may be reduced and the program's share increased as the tenant's circumstances change. Thus, for any Section 8 holder receiving these deductions, Goldfarb will assume the tenant's share of the rent to be higher than it actually is. *See* 10/27/2022 Tr. 32:11–33:22 (Miller confirming that even if "Section 8 says from [their] perspective [that an applicant] make[s] $700 gross a month, [] from [Goldfarb's] perspective… [an applicant] still make $1,000 gross a month").

### c. *Testimony of Kiana Glanton*

Kiana Glanton, a vision impaired woman, testified at trial that she applied for a rental in a Goldfarb property in May of 2021, when the 2019 Policy was in effect. At the time she applied, Glanton had a Section 8 voucher. Because of her vision impairment, her friend, Alicia Suggs, assisted her in preparing and submitting the online application. The rent for the apartment she applied for was $2,110. Glanton Testimony, 10/28/2022 Tr. at 368:17. Goldfarb denied her application for "insufficient income" in June 2021 even though she had a monthly income of $1,900 and a Section 8 voucher. *Id.* at 370:17–371:21; *see also* Section 8 May 2021 Voucher, Defs. Ex. BBB. The denial letter Glanton received in June 2021 informed her that she could reapply after 60 days (August 2021), which was after her May 2021 voucher was set to expire. 10/28/2022 Tr. at 371:09–21. She then requested an extension for her voucher, which was granted, with a new expiration date of September 11, 2021. *Id.* at 372:15–24; *see also* Pl. Ex. 75.

12

SPA-21

When she applied a second time in August 2021, 10/28/2022 Tr. at 376:24–377:17, she did so with Suggs as her guarantor in hopes that Goldfarb would approve her application if she had a guarantor. *Id.* at 379:10–24. Suggs assisted in submitting the application again and Glanton's recollection is that she included the extended voucher with her second application. *Id.* at 377:03–08, 380:13–381:01, 390:24–391:04.

However, the August 2021 application Glanton submitted to Goldfarb with the second application included the same voucher uploaded in May 2021, which had expired in July. Defs Ex. CCC. Glanton called the Goldfarb office to confirm she had uploaded the correct documents and informed the staff that because she was visually impaired she needed extra assistance to confirm all of the documents were correct. 10/28/2022 Tr. at 380:18–381:01. In early August, Glanton's application was denied for a second time. When Glanton called Goldfarb, the staff told her that the apartment had already been rented out, and she later received a rejection letter. *Id.* at 399:6–9. The rejection letter stated "voucher insufficient" as the reason for the denial, with no further explanation as to what that meant. Pl. Ex. 76. Glanton testified that Goldfarb told her that her application was denied because the voucher had expired. 10/28/2022 Tr. at 399:6–9. Glanton subsequently retained an attorney, Ali Frick.

In November 2021, Frick emailed Goldfarb to schedule a viewing of an available apartment and attached a valid Section 8 voucher to the email. Defs. Ex. DDD. Pursuant to negotiations between Frick and Goldfarb, Glanton entered into an agreement with Goldfarb on December 9, 2021, whereby Goldfarb denied any discrimination and Glanton accepted a one year rent stabilized lease. Defs. Ex. EEE.

### B. Findings on Disputed Issues of Fact

Both FHJC and Defendants rely on expert testimony to establish the adverse impacts, if any, of Goldfarb's policies on applicants with subsidies. Dr. Steil, FHJC's expert, submitted a report in August 2019 that analyzes the impact of both the 2015 Policy and the 2019 Policy.

Dr. White wrote three reports: one in October 2019, one in February 2021, and a third in April 2021 which amended the second report. The first report analyzed whether the selection rate of applications with a subsidy under the 2019 Policy was consistent with the selection rate of applications without a subsidy. Dr. White conducted his analysis by reviewing data from spreadsheets provided by Goldfarb for seven of its buildings. *See* October 2019 Report, Defs. Ex. Y at 2–3. His analysis covered two periods: November 2016–February 2018, and January–June 2019 (when Goldfarb alleges they instituted the 2019 Policy).

The second report reviewed data collected for apartment applications in seven of Goldfarb's properties for the period May 1, 2019 through August 31, 2020. Dr. White's analysis measured the effects of the 2019 income and credit requirements on the denial rate of applications which included a subsidy and those which did not include a subsidy. The third report was prepared in April 2021 in response to questions raised by Dr. Steil about data used by Dr. White. It amended the second report by conducting the same statistical analysis as the second report, but using updated data provided by Goldfarb. In an affidavit submitted on November 24, 2021, Dr. Steil conducted an analysis in response to Dr. White's April 2021 report and critiques Dr. White's findings as "present[ing] an incomplete and flawed picture of the effect of the 2019 [P]olicy." Steil Aff., Pl. Ex. 70 ¶¶ 147, 152.

14

The experts disagreed with respect to:  whether the applicant pool each expert used was probative; whether applicants with partial and full subsidies should be treated as two distinct groups; and whether applications that included a subsidy denied for "insufficient voucher" or "no contact" should be included in the analysis.  The Court first summarizes the expert reports.

### 1. Dr. Steil's Expert Testimony

Dr. Steil's report concludes that the 2015 Policy had a significant and adverse impact on both disabled applicants and applicants with housing subsidies because it required tenants to (1) spend no more than 40 percent of their net income on rent, and (2) have a gross income equal to at least 43 percent the monthly rent, irrespective of any subsidy the tenant received.  Steil Aff., Pl. Ex. 70 ¶ 131.

In conducting his analysis, Dr. Steil looked to the pool of potential applicants for housing units generally and not just applicants for Goldfarb apartments.  *Id.* ¶ 102.  He testified that this was the most relevant and appropriate available data because Goldfarb's website statement—that interested applicants should not apply unless their gross income was at least 43 times the monthly rent— could have discouraged potential applicants from applying at all and made the actual Goldfarb applicant pool less probative.  *Id.*  Dr. Steil used this general pool of applicants to assess the effects of Goldfarb's policies under two tests:  the *Comer* test and the "four-fifths" test.

In *Comer*, which take its name from a Second Circuit case, the court assessed disparate impact by comparing the percentage of minority families holding Section 8 vouchers with the percentage of minorities on the waiting list for housing.  *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).  The Belmont Section 8 Program, which

administered the Section 8 program for the town of Amherst and other suburban communities outside the city of Buffalo, adopted a local preference in favor of applicants who lived or worked in one of the suburban communities within Belmont's administrative jurisdiction. *Id.* at 784. This local residency preference resulted in minority families holding only 3% of the over 2,000 vouchers issued by Belmont, despite the fact that 21% of the over 3,800 families on the waiting list were minority families. *Id.* at 793. The Second Circuit held that this residency preference policy was racially discriminatory because it "impede[d] persons who live in the City of Buffalo, which has a higher percentage minority population than the suburbs, from obtaining rental assistance available under Belmont's program, thereby giving subsidies to a disproportionate number of white suburban residents ahead of minority city dwellers." *Id.* at 792.

Dr. Steil drew the parallel between the findings in *Comer* and the data set in the instant case to conclude that the 2015 Policy had an adverse impact on persons with subsidies and people with disabilities.

First, he compared the share of protected class members (those with housing subsidies) in the applicant pool to the share of protected class members that could pass the Goldfarb income test. *See* Steil Aff., Ex. 70 at ¶ 123. He found that applicants with subsidies were 17 times less likely to pass the income test than applicants with no subsidies. *Id.* at ¶ 125. He also found that it was not possible for people eligible for OHS, people eligible for HASA, and 97% of the households eligible for a Section 8 voucher to satisfy Goldfarb's rental requirements. *Id.* ¶¶ 74–100.

He also compared all households that relied on subsidies with all households that did not. Taken together, 52% of participants in the OHS, HASA, and Section 8 voucher

programs have a disabled household member and yet less than 3% of those applicants could meet the income test under the 2015 Policy.[11] *Id.*

By comparison, only 20% of households that did not rely on subsidies have a disabled household member.  The parallel to *Comer* is that while 52% of applicants for Goldfarb units would be expected to be disabled, less than 3% could meet the income test.  Dr. Steil concluded that rejecting 97% of persons with OHS, HASA, and Section 8 vouchers has an adverse impact on persons with subsidies and people with disabilities under *Comer. Id.* ¶ 108.  Additionally, his analysis found that households that rely on subsidies are more than 2.5 times as likely as households that did not rely on subsidies to have a disabled household member.  Accordingly, Dr. Steil concluded that the 2015 Policy had an adverse impact on persons with disabilities under the *Comer* test.  *Id.*

The second test Dr. Steil conducted was the four-fifths test, adopted from the Equal Employment Opportunity Commission ("EEOC") and used in an FHA case in the First Circuit to determine if a difference in selection rates constitutes a disparate impact. *Langlois v. Abington Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000); *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33, 57–59 (D. Mass. 2002).  Under this test there is a disparate impact if the selection rate for any protected group is less than four-fifths (or 80 percent) of the selection rate for the group with the highest selection rate.[12]

---

[11] Dr. Steil took the average of 46% of all Section 8 households including a person with disabilities and 100% of OHS and HASA households including a person with disabilities to arrive at 52%.

[12] This test consists of a four-step process to assess the adverse impact of a policy by:  (1) calculating the rate of the selection for each group (by dividing the number of persons selected from a group by the number of applicants from that group); (2) observing which group has the highest selection rate; (3) calculating the impact ratios, by comparing the selection rate for each group with that of the highest group and; (4) observing whether the selection rate for any group is substantially less than the selection rate for the highest group.  If it is, an adverse impact is indicated in most circumstances.  *Langlois v. Abington Hous. Auth.*, 207 F.3d at 50; *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d at 57–59.

Dr. Steil compared the number of all households with and without disabled members and all households with or without disabled members that have OHS, HASA, or Section 8 subsidies.  He concluded that the 2015 Policy disproportionately disqualified households with disabled members, because it effectively disqualified all OHS and HASA applicants and 97% percent of Section 8 applicants.  Steil Aff., Pl. Ex. 70 ¶ 116. For households without a disabled member, only 4% of applicants were denied based on the income test.  On the other hand, 16% of households that rely on subsidies and have a disabled household member were disqualified.  He goes on to state that

> households with a disabled … member are [] three times more likely than those without a disabled …  member to be eligible for one of these three housing subsidies, and are therefore more than three times more likely than other renter households to be adversely affected by Goldfarb's exclusion of Section 8, HASA, or OHS voucher applicants[] …. this disparity ratio of 3.79 is well above the 1.25 threshold used in the four-fifths test.

*Id.* ¶ 119.  Thus, Dr. Steil concludes that because the 2015 Policy excludes more than 97 percent of applicants with housing subsidies, and households with a disabled household member are over three times more likely to be eligible for one of these three housing subsidies, there is a substantial disparate impact on subsidy and disabled renters.

Dr. Steil also analyzed the effect of the 2019 Policy using all applicants with and without subsidies, treating the 2019 Policy as three different policies— one for applicants without a subsidy, one for applicants with a partial subsidy, and one for applicants with a full subsidy.  He included all of the reasons for denial (credit denial, income denial, insufficient voucher, not qualified, no contact denial), and excluded those applications that were duplicates, pending, or canceled by the applicant. [13]

---

[13] "No contact" denials occur when Defendants are not able to reach an applicant for further communication.

Dr. Steil concluded that comparing all applicants without a subsidy to all applicants with a full subsidy, 30% of applicants without a subsidy were approved and 53% of applicants with a full subsidy were approved. *Id.* ¶ 193. However, comparing all applicants with a partial subsidy to all applicants with a full subsidy, 30% of applicants without a subsidy were approved, but only 13% of applicant with a partial subsidy were approved. In other words, applicants with a partial subsidy were approved at less than half the rate of applicants with no subsidy. *Id.* ¶ 195. Even excluding the "no contact" denials, the approval rate for applicants with a partial subsidy is only 20%, just two-thirds of the rate for applicants with no subsidy. *Id.* ¶ 197. Thus, Dr. Steil concluded, the 2019 Policy has a substantial adverse impact on applicants with partial subsidies. *Id.* ¶ 196.

### 2. *Dr. White's Expert Testimony*

Defendants support their counterclaim that the 2019 Policy does not constitute unlawful discrimination on the basis of source of income or disability with Dr. White's expert testimony. Defs. Answer to SAC and Counterclaim, Doc. 94 ¶ 152.

In his October 2019 report, Dr. White identified applicants with disabilities using three different definitions.[14] Dr. White's October 2019 Report, Defs. Ex. Y at 10. For the data set, he used a spreadsheet provided by Goldfarb that showed how many applicants applied that did not have subsidies, if they were accepted or rejected, and the reason for the decision. He only compared applications that did not have subsidies with applications that did include subsidies, without distinguishing between applicants with

---

[14] First, he screened for any application that mentioned phrases such as "disability," "HASA," and "workers comp," among others. Secondly, he included in the definition of disability those applicants that were on Social Security, reasoning that because people over 62 are more likely to be disabled than the population at large, Social Security can serve as a proxy for applicants with disabilities. Third, he identified applications with HASA, OHS, or Section 8 subsidies.

SPA-28

partial and full subsidies.  He concluded that under the first definition of disability

applications (applications that mentioned phrases such as "disability," "HASA," and

"workers comp," among others) the difference between the actual and expected number

of qualified applications was neutral, in part because of the small number of disability

applications in 2019; under the second definition (including those applicants that were on

Social Security), the difference between actual and expected number of qualified

applications with disability was neutral; and under the third definition (applications with

HASA, OHS, or Section 8 subsidies) the results were neutral, partly because of the low

count of applications with HASA, OHS, or Section 8 subsidies. *Id.* at 29.

Dr. White's April 2021 report focused on the applications denied due to

insufficient income or credit to test the effects of the new thresholds prescribed by the

2019 Policy.  Dr. White excluded "insufficient voucher" and "no contact" as reasons for

denials.  Dr. White's April 2021 Report, Defs. Ex. BB at 8.  "Insufficient voucher"

denials occurred when Goldfarb determined that the rent of the apartment was outside the

range that the applicant's subsidy would allow and "no contact" denials occur when

Defendants are not able to reach an applicant for further communication.  He contends

that these denials are for reasons other than Goldfarb's 2019 Policy requirements. *Id.* at

10.

Dr. White concluded that applications that included subsidies are not denied more

than expected when compared to applications that did not include subsidies due to the

new income and credit requirements, and that there were no statistically significant

adverse effects on applicants that relied on subsidies regardless of subsidy type or

decision being analyzed (insufficient credit, insufficient income, or combined). *Id.* at 22.

20

### 3. *Dr. Steil's use of general publicly available data is appropriate*

Dr. White testified that Dr. Steil's analysis is flawed because he used general population data instead of actual applicant data, which was available to FHJC and would be more probative of disparate impact. Dr. Steil argues that relying upon external data for the pool of potential applications is appropriate because of the possibility that applicants may have been discouraged by the income requirement posted on Goldfarb's website. The Court agrees that relying on external data is appropriate for this analysis because the applicant pool was limited in light of Goldfarb's dissemination of its 2015 Policy through its website and rental agents. *See* Pl. Ex. 54 (Goldfarb's webpage stating that applicants are required to have a income at least 43 times the amount of the monthly rent); *see also* Pl. Exs. 60, 61, 67, 20–22 (employees of Goldfarb Properties confirming Goldfarb's policy of requiring that all applicants earn 43 times the total rent in income to FHJC's test callers).

> Indeed, these types of [general population] data often form the initial basis of a disparate impact claim, especially in cases such as this one in which the actual applicant pool might not reflect the potential applicant pool, due to a self-recognized inability on the part of potential applicants to meet the very standards challenged as being discriminatory.

*E.E.O.C. v. Joint Apprenticeship Comm. Of Joint Indus. Bd. of Elec. Indus.*, 164 F.3d 89, 97 (2d Cir. 1998). "Where … a defendant is alleged to have informed the potential applicant pool – here through advertising and external communications with … potential tenants – of the policy, an expert may properly account for potential applicants that may have been discouraged from applying due to an awareness of the policy…." *Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F. Supp. 3d 145, 170 (E.D.N.Y. 2019).

SPA-30

### 4. *Applicants with partial and full subsidies should be treated as two distinct groups*

Dr. White treated applicants with partial and full subsidies as one group. Dr. White Testimony, 10/28/2022 Tr. at 290:2–7. In contrast, Dr. Steil took the position that the 2019 Policy is essentially three policies in which applicants with no subsidy, partial subsidies, and full subsidies are subject to different criteria. Whereas applicants with a full subsidy do not have an income criteria, applicants with a partial subsidy do. The Court agrees that these two groups should be treated differently in the analysis. Tellingly, looking only at the applicants with a partial subsidy reveals a statistically significant difference between the acceptance for applicants with a partial subsidy and applicants with no subsidy, with 30% of applicants with no subsidy approved, compared with 13% of applicants with a partial subsidy. Steil Aff., Pl. Ex. 70 ¶¶ 171, 195–96. Even excluding "no contact" denials, the approval rate for applicants with a partial subsidy is two-thirds of the rate for applicants with no subsidy. *Id.* ¶ 197.

### 5. *It was appropriate to include applications that relied on subsidies denied for "insufficient voucher" in the analysis*

Dr. White argues that Dr. Steil was incorrect in including applicants with subsidies that that were denied for "insufficient voucher" in his analysis. These denials occurred when Goldfarb determined that the rent of the apartment was outside the range that the applicant's subsidy would allow. Dr. White contends that this denial is for reasons other than Goldfarb's 2019 Policy requirements. Defs. Ex. BB at 11. Dr. Steil argues that excluding denials for "insufficient voucher" is problematic and makes it impossible to assess the full effect of the 2019 Policy. Steil Aff., Pl. Ex. 70 ¶¶ 173, 176. The determination of whether to include denials for "insufficient voucher" or not is

22

pivotal.  Indeed, Dr. White testified that "the insufficient voucher topic is the one that determines the difference between statistical significance and nonstatistical, and a disparate impact and [not a] disparate impact."  10/28/2022 Tr. at 299:20–25.

Dr. White's position is that applications that are rejected for voucher insufficiency occur because the applicant applied to an apartment with a higher rent than the voucher can cover.  Dr. White April 2021 Report, Defs. Ex. BB at 9–10.  But Dr. Steil maintains that this is not necessarily true and can change depending on a determination of three options:  (1) what rent amount to use, which may be the rent for the unit the applicant applied for or the rent for another comparable available unit; (2) the amount the voucher would pay; and (3) as explicitly set out in Section 8 regulations, a determination of whether the applicant may be able to afford to contribute more to the rent than their expected share in order to afford a rent higher than the voucher payment standard.  Steil Aff., Pl. Ex. 70 ¶ 175.

Regarding the first option, the Court notes that Goldfarb did engage in this practice at times.  Miller testified that when an apartment an applicant applied for was no longer available, a leasing agent contacted the applicant to determine if the applicant would be interested in another available apartment in the building.  2/27/2022 Tr. at 168:20–169:4.  On redirect, Dr. Steil insisted that there were other options Goldfarb could offer, such as offering apartments in another building or borough, and instituting a waitlist in which applicants would be contacted when units within their payment range became available.  10/28/2022 Tr. at 256:13–257:8.

As to the second option, Steil testified that, for example, there is discretion in the HASA program to pay higher amounts if it is beneficial to the health of that applicant

SPA-32

based on that applicant's needs and the characteristics of the apartment (e.g., a building with an elevator). *Id. at* 190:7–11.

Regarding the third option, Dr. Steil testified that under certain circumstances Section 8 voucher holders could make up the gap between the rent limits on their vouchers and the rent by adding 10% of their adjusted gross incomes to the rent payments. Dr. Steil also testified that he found "more than 15" such cases in his analysis of the Goldfarb data.[15] Steil Aff., Pl. Ex. 70 ¶¶ 187–88. Miller testified that Goldfarb takes account of the tenant option to add 10% of their rent limits of the Section 8 vouchers. *See* Miller Testimony ¶¶ 24–25.

The Court finds that Dr. Steil's methodology of including "insufficient voucher" as a denial category was proper because it accounts for "more than one out of every four" denials of applicants with subsidies. Steil Aff., Pl. Ex. 70 ¶ 176.

6. *It was appropriate to include applications with subsidies denied for "no contact" in the analysis*

Dr. Steil also included applicants with subsidies that were denied for "no contact" in his analysis. Dr. Steil argues that excluding "no contact" denials presents a misleading view of how voucher applicants fare under the 2019 Policy. Steil Aff., Pl. Ex. 70 at ¶ 180. These denials can be triggered either by the actions of the applicant or by the discretionary determinations of Goldfarb's agents. *Id.* at ¶ 178. Defendants contend that this denial is for reasons other than Goldfarb's 2019 Policy, reasoning that applicants who stop communicating with Goldfarb during the application process were not

---

[15] Dr. Steil did not specifically identify any of those "more than 15" applicants. 10/28/2022 Tr. at 220:11–221:5.

"rejected" by Goldfarb, but rather voluntarily dropped out of the application process. Defendants' Proposed Finding of Facts and Law ¶ 67.

Goldfarb's leasing agents have discretion as to when to contact the applicant, how many attempts to make to contact the applicant, what time of day to attempt contact, and what means to make contact (email or phone call). *See* Miller Testimony, 2/27/2022 Tr. at 164:20–165:9. The leasing agent also has discretion to decide when an applicant can officially be categorized as "no contact." *Id.* at 165:10–12. Dr. White admitted that it is possible that, absent any written policy, the ability to reach an applicant can depend partly on Goldfarb, and that its leasing agents can take actions that make certain applicants more or less likely to receive a "no contact" denial. Dr. White Testimony, 10/28/2022 Tr. at 295:20–296:14. Both Miller and Dr. White testified that they are not aware of any written policy regarding contact attempts or how long to wait before categorizing an applicant as "no contact," and Goldfarb did not produce any records at trial showing the basis for these denials. *Id.*; *see also* 2/27/2022 Tr. at 165:13–15.

Perhaps most importantly, according to the data, applicants with subsidies are rejected for "no contact" 30% of the time, while applicants with no subsidy are rejected for "no contact" 14% of the time. As Dr. Steil testified, "it raises the question of why this rate is so different." 10/28/2022 Tr. at 254:25–255:1. Accordingly, the Court finds that the inclusion of applicants with subsidies rejected for "no contact" is appropriate.

Because the Court has found that it was appropriate to include applicants with subsidies who were denied due to "insufficient voucher" and "no contact," and to distinguish between applications that included a full subsidy and applications that included a partial subsidy, the Court adopts Dr. Steil's finding that there was a

25

statistically significant difference between applicants with no subsidy and applicants with partial subsidies.

## III.   CONCLUSIONS OF LAW

### A. The 2015 Policy

*1.  Disability Discrimination Under the FHA*

A plaintiff asserting a claim for housing discrimination based on disability under a disparate impact theory of liability must initially prove (1) the occurrence of certain outwardly neutral practices; and (2) a significantly adverse or disproportionate impact on a group of persons produced by the defendant's facially neutral acts or practices.  *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016).  Once a plaintiff has established these two elements, the burden shifts to a defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide [] interest."  *Mhany Mgmt.,* 819 F.3d at 617 (internal citation and quotation marks omitted).  If defendants meet that burden the plaintiff must then show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect."  *Id.* (citing 24 C.F.R. § 100.500(c)(3)).

First, Defendants did have an outwardly neutral practice requiring rental applicants to meet a minimum income requirement based on the full rent.  Secondly, FHJC argues that because OHS and HASA voucher holders are used only by households with disabled persons, and 47% of Section 8 households include an individual with a disability, the 2015 Policy adversely affected applicants with subsidies that have a disabled person in the household.  In response, Defendants contend that FHJC has offered no statistical evidence concerning the correlation between disability and source of

income, and thus cannot prove that Defendants' policies and practices have a disproportionate effect on persons with disabilities.  The Court disagrees.

FHJC did show a correlation between disability and source of income as it related to OHS and HASA subsidies because those programs are only used by households with a disabled individual.  Steil Aff., Pl. Ex. 70 ¶103.  For Section 8 vouchers, FHJC demonstrated a disparate impact on applicants with disabled household members by making an inference from general population data showing that there is a higher than average number of households with disabled persons among Section 8 voucher holders.  *Id.* ¶ 104.

Defendants point to the ruling in another FHA disparate impact case in which FHJC was a plaintiff, *Short v. Manhattan Apartments, Inc.* 916 F. Supp. 2d 375 (S.D.N.Y. 2012).  In that case, FHJC and a prospective tenant with AIDS who had a HASA subsidy, brought a housing discrimination action against real estate brokers, alleging that brokers had refused to rent to that tenant and others, based on disability and source of income discrimination.  The court found that plaintiffs failed to make their prima facie case of disability discrimination under the FHA because plaintiff's disparate impact analysis conflated disability, which is a protected status under the FHA, with source of income, which is not.  *Id.* at 393.  The court also found that because "[p]laintiffs … offered no statistical evidence concerning the correlation between disability and source of income, the [c]ourt cannot conclude that Defendants' policies and practices have a disproportionate effect on persons with disabilities."  *Id.*

Unlike the plaintiffs in *Short v. Manhattan Apartments, Inc.* who offered *no* statistical evidence and showed no disproportionate impact of the policy on people with

disabilities, FHJC has offered statistical evidence concerning the correlation between disability and the three specific subsidies it alleges Goldfarb's policies have affected. *Id.*

Nevertheless, Defendants argue that FHJC has not made its prima facie case because it "merely raises an inference of discriminatory impact." *Tsombanidis v. W. Haven Fire Department*, 352 F.3d 565, 575 (2d Cir. 2003). Defendants allege that FHJC has failed to show evidence of a robust causality because it used general population data rather than actual applicant data, which was available. Defendants argue that national or state general data are appropriate where actual applicant data is not available, citing to *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308–09 n.13 (1977). However, this footnote does not support their argument. In *Hazelwood,* the Supreme Court noted that general statistics were highly probative, but that the actual data would be relevant if it was available. *Id.* In the instant case, the actual data on the number of applicants that had a disability is not available because Goldfarb does not inquire whether applicants had a disability. 10/28/2022 Tr. 313:3–314:2. In any event, as discussed *infra*, the Second Circuit's opinion in *E.E.O.C.*, twenty years after *Hazelwood*, endorsed the use of general population data as appropriate in the exact circumstances presented in this case. *E.E.O.C.*, 164 F.3d 89, 97 (2d Cir. 1998). *See also Malave v. Potter*, 320 F.3d 321, 327 n.4 (2d Cir. 2003) (holding that the District Court could not reject employee's statistical evidence in support of his disparate impact claims simply because it failed to focus on applicant pool or eligible labor pool for at-issue promotions, where such data were not available; and observing that "[i]t may be that, even if the data were available, the applicant pool would not have been the most appropriate underlying labor pool…").

SPA-37

Having established the first two elements, the burden shifts to the Defendants to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide [] interest." *Mhany Mgmt.*, 819 F.3d at 617.  Goldfarb argues that it has a "crucial interest in renting only to tenants who can afford to pay the rent" and that reviewing an applicant's income is the only way to measure the ability of an applicant to do so. Defendants' Post-trial Memorandum of Law at 6.  Goldfarb argues that the 2015 Policy was created to reduce the high level of rent arrears among Goldfarb tenants.  However, Goldfarb did not evaluate, let alone determine, that subsidy tenants contributed to those high arrears, and did not analyze the frequency with which subsidy holders did or did not pay their portion of the rent, despite having the data within the company's business records to conduct such an analysis.  And with respect to applicants with full subsidies specifically, which by definition cover 100% of the rent, Schaper acknowledged in his testimony that Goldfarb had no need to look at these applicants' income.  2/7/2022 Tr. at 52:23–53:01, 81:10–81:17.  Yet, Goldfarb imposed these income requirements on applications with full subsidy for over four years.  *Id.* at 50:10–52:02, 53:15–18, 58:07–21.

It cannot be the case that excluding applicants with full subsidies, whose voucher programs pay the full rent, was necessary to further Goldfarb's interest of reducing the high level of rent arrears among its tenants.

Because Defendants have not met their burden to prove that the 2015 Policy was necessary to achieve its interest, the Court finds for FHJC on the disability discrimination claim for Goldfarb's 2015 Policy under the FHA.

SPA-38

### 2. *Disability Discrimination Under NYCHRL*

In evaluating claims based on a disparate impact theory of liability under both the FHA and NYCHRL, courts apply the burden shifting framework described above. *Williams v. Regus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011). In the context of a NYCHRL claim, however, the Court must "address the NYCHRL's 'uniquely broad and remedial purposes, which go beyond those of counterpoint State or federal civil rights laws.'" *Id.* (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 31 (1st Dep't. 2009)). Because the Court has found that FHJC has prevailed on its FHA disability claim, and the same analysis is applied, the Court finds for FHJC on the disability discrimination claim for Goldfarb's 2015 Policy under the NYCHRL.

### 3. *Source of Income Discrimination Under the NYCHRL*

While source of income discrimination cannot be a basis for an FHA violation, it is prohibited by the NYCHRL. Section 8-107(5)(a) of the New York City Administrative Code provides that it shall be

> an unlawful discriminatory practice for the owner, lessor, lessee, sublessee, assignees, or managing agent of, or other person having the right to sell, rent or lease or approve the sale, rental or lease of a housing accommodation . . . (1) To refuse to sell, rent, lease, approve the sale, rental or lease or otherwise deny to or withhold from any person or group of persons such a housing accommodation or interest therein because of . . . source of income of such person or persons.

NYC Admin. Code § 8-107(5)(a). NYCHRL discrimination claims follow the same burden shifting framework as federal discrimination claims. *Williams,* 836 F. Supp. 2d at 171. Within that framework, however, "courts must address the NYCHRL's 'uniquely broad and remedial purposes, which go beyond those of counterpoint State or federal civil rights laws.'" *Id.* (quoting *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 258 (S.D.N.Y.

30

2009)).  Thus, FHJC must prove two elements:  (1) the occurrence of certain outwardly neutral policies or practices; and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. *Mhany Mgmt., Inc.*, 819 F.3d at 617.  Once these two elements are established, the burden shifts to the defendant to "prove that its actions furthered, in theory and in practice, a legitimate, bona fide [] interest." *Id.* (citation and internal quotation marks omitted).  If Defendants can meet their burden then FHJC must show that the "interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

### a.  Disparate Impact

First, FHJC has identified a neutral policy in Defendants' 2015 Policy of requiring all applicants, including subsidy holders, to meet the 43-times-the-rent requirement.  Schaper testimony, Defs. Ex. UU ¶¶ 24–25.  Secondly, FHJC has established disparate impact with Dr. Steil's finding that 100% of OHS applicants, 100% of HASA applicants, and 97% of Section 8 applicants would not be able to satisfy Goldfarb's 2015 Policy.[16]  Steil Aff., Pl. Ex. 70 ¶¶ 92–93, 97.  The burden now shifts to Defendants to show that there was a legitimate business justification for the 2015 Policy.

Defendants argue that the 2015 Policy was facially neutral with respect to the applicants' sources of income and that the criteria treated all sources of income the same, including rent subsidies, which Goldfarb included as income in evaluating applications. *See* Schaper Testimony, Defs. Ex. UU ¶¶ 11, 25.  However, under a theory of disparate

---

[16] Dr. White did not perform any analysis under the 2015 Policy as to whether there is an adverse impact on applicants with subsidies, irrespective of disability status. *See* Defs. Ex. Y; *see also* White Testimony, 10/28/2022 Tr. at 305:6–22.

SPA-40

impact, the policy is unlawful if it has an unjustified significant adverse effect on a protected group, in this case subsidy holders, regardless of its neutral application. *See Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 491 (2001) ("[A] claim is established where a plaintiff demonstrates that a defendant's policy or practice results in a disparate impact to the detriment of any group protected under the City Human Rights Law") (internal quotations omitted). Accordingly, the Court will analyze whether Defendants meet their burden to show that there was a legitimate business justification for this requirement.

As discussed above, Defendants' purported justification of reducing the high level of rent arrears among Goldfarb tenants was not sufficient to support their 43-times-the-rent policy for applicants with subsidies. Defendants insist that insofar as the 2015 application criteria had an adverse disparate effect on the applicants with subsidies, "the effect was the result of applying neutral criteria in literal compliance with the statutes forbidding discrimination based on source of income." Defendants' Post-trial Memorandum of Law at 45. This reasoning is unpersuasive.

While Defendants are correct that subsidies are "sources of income," that does not mean that vouchers can be construed like cash income. That is to say, rental subsidies are not disposable income available to be used for just any expense. Rather, rental subsidies are guaranteed rent payments made directly to the landlord. Indeed, at trial Schaper acknowledged that treating subsidies like cash income and applying the 2015 Policy criteria was in effect, crediting only 40% of the voucher which can only be used to pay rent directly to a landlord. *See* Schaper Testimony, 2/7/2022 Tr. 77:21–80:01.

In addressing the NYCHRL's "uniquely broad and remedial purposes," *Sealy,* 688 F. Supp. 2d 247, at 258, it is evident that the intention behind the source of income

32

discrimination provision of  § 8-107(5)(a) was to avoid precisely what Goldfarb's 2015 Policy accomplished—discriminatory outcomes for applicants with subsidies.  Subsidies are intended to be used solely for rent payments in order to guarantee recipients the ability to afford housing.  Goldfarb's 2015 Policy was discriminatory and prevented applicants with full or partial subsidies from accessing housing.

Because Defendants have not provided evidence that there was a legitimate business justification for this requirement, FHJC need not show that the "interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Mhany Mgmt., Inc.*, 819 F.3d at 617 (citation and internal quotation marks omitted).

Accordingly, the Court finds for FHJC on the discrimination claim based on source of income pursuant to the NYCHRL.

### b.   *Intentional Discrimination/Disparate Treatment*

FHJC also claims intentional discrimination, or disparate treatment, based on source of income under the NYCHRL.  A plaintiff need only show that the protected class was treated "less well . . . because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).  In evaluating such claims, courts consider the "totality of the circumstances" as "the overall context in which the [challenged conduct occurs] cannot be ignored." *Id.* at 111 (quoting *Hernandez v. Kaisman*, 957 N.Y.S.2d 53, 59 (1st Dep't 2012)).

Defendants argue that they have acted in accordance with their good faith understanding of the law and therefore did not commit intentional discrimination against applicants with subsidies.  Defendants' Memorandum of Law at 31, 45.  For instance,

33

SPA-42

Schaper and other Goldfarb staff attended a seminar given by an expert on housing

discrimination and Goldfarb retained two fair housing lawyers to help develop the 2015

Policy.  10/27/2022 Tr. at 105:21–25, 106:18–107:7.

 The overall context of the treatment of applicants with subsidies pursuant to the

2015 Policy is such that Defendants, at best, should have known about the disparate

treatment of such applicants, and at worst, intentionally treated applicants with subsidies

less well because of discriminatory intent.  For example, prior to the implementation of

the 2015 Policy, Goldfarb entered a settlement in *Goode* after being sued for source of

income discrimination.  After Defendants implemented the 2015 Policy, Goldfarb was

aware that subsidy holders could not meet the 43-times-the-rent requirement from their

interactions with the FHJC test callers in relation to the instant case.  *See* FHJC Test

Caller Affidavits, Pl. Exs. 60, 61, 67 (detailing how they informed multiple Goldfarb

employees of how subsidies worked and that applicants with subsidies would not be able

to meet the income requirement).  Defendants were aware of how these subsidies worked,

as well as the difference between subsidies and income as it relates to making rent

payments from the test calls and from the housing discrimination training mandated by

the *Goode* settlement.  Further, written materials provided at these training sessions stated

explicitly that a policy requiring applicants with subsidies to earn "x times the rent" is

discrimination based on lawful source of income.  Pl. Ex. 57 at 18.  Nonetheless, no

Goldfarb staff member took any action to change Goldfarb's policy.

 Defendants' 2015 Policy also treated applicants with subsidies less favorably on

its face.  While Goldfarb assessed the income of applicants with no subsidies only against

their portion of the rent (i.e., the full rent), Goldfarb assessed the income of applicants

34

with subsidies against both their rent share and the voucher share of the rent for which they were not personally responsible.  This disparate treatment alone reflects intentional discrimination, as applicants with subsidies were forced to satisfy an unreachable and illogical standard (i.e., to prove they could pay rent for which they had no personal responsibility).

Further, Goldfarb evaluated applications with subsidies differently than applications with no subsidy.  Goldfarb employee Dunn was responsible for evaluating applications with no subsidy while Miller and Schaper were reviewing applications with subsidies.  Dunn regularly applied a 5% variance to Goldfarb's net income policy, thus approving applicants with no subsidy with a rent-to-income ratio as high as 45%.  Meanwhile, Schaper and Miller applied the 40% rent-to-income ratio requirement rigidly, and only granted exceptions in limited circumstances.

Goldfarb "engaged in discrimination with willful or wanton negligence, or recklessness, or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard." *Chauca v. Abraham*, 30 N.Y.3d 325, 334 (2017) (citation and internal quotation marks omitted).  After being sued by *Goode* and becoming aware of its discriminatory practices against applicants with subsidies, and receiving fair housing training, Goldfarb adopted its 2015 Policy without conducting any analysis of how this policy would affect applicants with subsidies.  *See* Schaper Testimony, 2/7/2023 Tr. 59:1–60:2.

SPA-44

The totality of the circumstances of Goldfarb's reckless indifference amount to intentional discrimination.[17]  Accordingly, the Court finds for FHJC on its intentional discrimination on the basis of source of income claim under the NYCHRL.

### B.  Defendants' Counterclaim

Defendants bring a counterclaim for a declaration that the 2019 Policy is lawful. FHJC asserts that the 2019 Policy is not lawful and asks that the Court dismiss the counterclaim.  FHJC makes four arguments in support of its position:  (1) the 2019 Policy directly contradicts NYCHRL agency guidance; (2) the 2019 Policy fails to account for subsidy programs' determination of what share of rent is affordable for a particular household; (3) Kianna Glanton's application experience demonstrates that the 2019 Policy still creates a significant unjustified exclusion of voucher holders; and (4) Dr. Steil's analysis reflects that the 2019 Policy continues to have an adverse impact on applicants with partial subsidies.  Finally, FHJC asserts that even if the Court were to find that the 2019 Policy is lawful, it is inadequate as a remedy for the years of discrimination Defendants engaged in and demand injunctive relief, compensatory damages, and punitive damages.

First, FHJC argues that Defendants are in direct contravention of the agency responsible for implementing the NYCHRL, the New York City Human Rights Commission, and that the Commission is entitled to deference.  Plaintiff's Proposed

---

[17] FHJC argues that Goldfarb's 60-day rule (barring applicant from reapplying after being denied an apartment) "has a clear disproportionate impact on applicants with subsidies of which Goldfarb was likely aware."  Plaintiff's Post-trial Memorandum of Law at 23 n.12.  However, this rule applies to applicants with and without subsidies alike, and FHJC has presented no evidence that the policy disproportionately impacted applicants with subsidies.  Moreover, Goldfarb has made exceptions for both applicants with and without subsidies in the past.

Finding of Fact and Conclusion of Law ¶¶ 243–44.  During the bench trial, FHJC offered

the Commission's "Best Practices for Housing Providers to Avoid Source of Income

Discrimination" ("Best Practices") into evidence in support of their position that

Goldfarb cannot require applicants with subsidies to meet a minimum income

requirement.  Pl. Ex. 69.  The Best Practices materials provide frequently asked questions

to help property managers meet their obligations as an owner, and in relevant part

provides:

> Q4. May I require all applications to make a minimum income such as
> $68,000 annually or 43* the monthly rent?  May I require co-signor or
> guarantor?
>
> A4. When a voucher program calculates the tenant(s)' rent based on their
> income, the government has already determined that they can afford to pay
> their required portion.  In some instances, tenants will pay no portion of the
> rent out of pocket.  *Where the tenants' rental portion is calculated based on
> the tenants' income, it is a violation of the Law to impose any additional
> income requirements on applicants for housing.*  You may not require
> guarantors or co-signers.

*Id.* (emphasis added).

"[A]n administrative agency's construction and interpretation of its own

regulations and of the statute under which it functions are entitled to great deference."

*Arif v. N.Y.C. Taxi & Limousine Comm'n*, 3 A.D.3d 345, 346 (1st Dep't 2004) (citations

omitted).  However, agency guidance like the Best Practices materials do not receive the

deference accorded formal regulations adopted after notice and hearing procedures.  *See

Schneider v. Feinberg*, 345 F.3d 135, 142 (2d Cir. 2003) ("Interpretations such as those

in opinion letters—like interpretations contained in policy statements, agency manuals,

and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-

style deference.") (quoting *Christensen v. Harris County*, 529 U.S. 576, 587 (2000)).

Consequently, far from FHJC's suggestion that the Commission's interpretation of the NYCHRL should be upheld, "interpretations contained in formats such as opinion letters are entitled to respect ... but only to the extent that those interpretations have the power to persuade." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York,* 273 F.3d 481, 490 (2d Cir. 2001), *adhered to on reconsideration,* 451 F.3d 77 (2d Cir. 2006) (internal quotes omitted).

Further, agency positions, including rules and regulations, must be "in harmony with" and must not contravene the statute construed. *Weiss v. City of New York,* 95 N.Y.2d 1, 4–5 (2000) (invalidating an elevator safety regulation that expanded statutory liability on non-operating owners because the regulation was inconsistent with a statute that imposed liabilities on operators). Here, similarly, there is nothing in the statute at issue, the source of income discrimination statute (§ 8-107(5)(a) of the New York City Administrative Code) stating that landlords cannot make an assessment of an applicant's ability to pay rent. The source of income statute only forbids discrimination; it does not require landlords to accept applicants with subsidies regardless of the amount of their incomes.

Additionally, because Goldfarb owns properties in Westchester County as well, it is appropriate to consider a local statute that specifically authorizes landlords to make their own assessment of prospective tenants' ability to pay, considering sources of income including government subsidies: The Charter and Administrative Code of Westchester County §700.20(V)(1)-(2). This statute provides that it shall not be considered discriminatory to make decisions based on an individual's income and defines source of income to include "any form of federal, state or local public assistance or

housing assistance, grant or loan program, including the federal housing subsidy known as 'Section 8.'"

Secondly, FHJC argues that the 2019 Policy leaves the door open to justified exclusions by failing to account for the various deductions that can be applied to Section 8 tenants.  According to FHJC, Goldfarb should take into account the deductions that the Section 8 program applies for dependents, childcare, disability assistance, unreimbursed medical expenses, and for elderly or disabled family members in the household.  However, Goldfarb does not know whether a Section 8 applicant qualifies for any of the deductions while they are processing the application.  *See* Miller Testimony, 2/7/2023 Tr. 162:11–12.  Moreover, Section 8 applicants can lose these deductions as circumstances change, causing an increase to their portion of the rent payments.  Miller Testimony, 10/27/2022 Tr. 34:18–35:6.  Nevertheless, FHJC maintains that Goldfarb should rely on each agency's determination and that Defendants have not offered any explanation for why Goldfarb must undertake its own calculation.  *See* Plaintiff's Post-trial Memorandum of Law at 28 n.15.  However, Goldfarb is correct that it is not unlawful for a landlord to ask about income or assess an applicant's ability to pay for housing, so long as they do not discriminate based on the subsidy, a lawful source of income.

Third, FHJC points to Kianna Glanton's application experience with Goldfarb as evidence that the 2019 Policy continues to create a significant unjustified exclusion of voucher holders.  However, the record reflects that in her second application Glanton did in fact include an expired voucher, and not the renewed voucher she was granted.  Defs Ex. CCC.  Thus, Goldfarb properly rejected her application for "insufficient voucher." This is far from a "baseless exclusion" of applicants with subsidies as FHJC alleges.

Fourth, FHJC argues that Dr. Steil's analysis reflects that the 2019 Policy continues to have an adverse disparate impact based on source of income, specifically on applicants with partial subsidies. Accordingly, the Court conducts the burden shifting analysis described above. FHJC has presented a prima facie case of disparate impact as the Court has adopted Dr. Steil's report which indicates, among other things (1) including all denial reasons, 30% of applicants with no subsidy are approved under the 2019 Policy compared with only 13% of applicants with partial subsidies, a statistically significant adverse difference and; (2) even excluding "no contact" denials, applicants with partial subsidies are only approved 20% of the time compared to applicants with no subsidy, who are approved 30% of the time, also a statistically significant adverse impact. The burden thus shifts to Defendants to prove that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Mhany Mgmt.*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(1)-(2) (2013)). The Court finds that Goldfarb's 2019 Policy, as it relates to applicants with partial subsidies, is not necessary to achieve its interest—assessing the ability of applicants for to pay the rent. Defendants have not offered any evidence reflecting that partial subsidy holders are not able to pay their portion of the rent absent the 2019 Policy, or provided any evidence reflecting that partial subsidy holders are unlikely to pay the portion of their rent that their programs have deemed them qualified to pay. Because Defendants have not met their burden, FHJC need not show that the "interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

Accordingly, the Court finds that the 2019 Policy is not lawful, but only as to the partial subsidy requirements.

SPA-49

**C. FHJC's Remedy**

FHJC argues that Defendants' 2019 Policy does not serve as an adequate remedy for the four years in which Goldfarb excluded OHS, HASA, and Section 8 applicants and as a result, it is entitled to injunctive relief, compensatory damages, and punitive damages for Defendants' four years of discrimination.

*1. Injunctive relief*

The FHA and NYCHRL authorize injunctive relief both to end future discriminatory practices and to provide appropriate action to eliminate the discriminatory effects of past illegal policies. 42 U.S.C. § 3613(c)(1); N.Y.C. Admin. Code § 8-502(a); *see also U.S. v. Yonkers Bd.* of Educ., 837 F. 2d 1181, 1236 (2d Cir. 1987) ("A district court has 'not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.'") (internal citation omitted). The Court must craft injunctive relief with a view toward the statute's goals of preventing future violations and removing lingering effects of past discrimination. *See Rogers v. 66–36 Yellowstone Blvd. Coop. Owners, Inc.,* 599 F. Supp. 79, 83 (E.D.N.Y. 1984) (internal citation omitted). The scope of the injunction is to be determined by the nature and extent of the legal violation. *Id.* The characteristics of the injunction must serve the "twin goals of eradicating the past discrimination and securing future adherence to our nation's equal housing commitment." *Id.*

In the instant case, Defendants have engaged in a consistent pattern of source of income discrimination. In 2015 Defendants were sued for their policy that openly refused to accept HASA subsidies. As part of the settlement, they were required to abide

41

SPA-50

by a general injunction not to make unavailable or withhold apartments because of a lawful source of income.  Pl. Ex. 68 ¶ 17; Pl. Ex. 27.  Shortly thereafter, Defendants adopted the 2015 Policy which, as the Court has found, continued to make it virtually impossible for applicants with subsidies to qualify under their income policy.

However, in 2019, Defendants adopted a new policy which this Court has found does not have a disparate impact on full subsidy holders, but does have a disparate impact on partial subsidy holders.  In general, injunctive relief is necessary where a defendant has not brought its policies and practices into compliance with the law and there is a likelihood that the illegal conduct will continue.  *USA v. Space Hunters, Inc.,* No. 00 Civ. 1781 (RCC), 2004 WL 2674608, at *8–9, *aff'd* 429 F.3d 416 (2d Cir. 2005).

In the instant case, Defendants have improved their rental criteria to lessen the discriminatory impact but did not entirely remove those criteria that limited access to Defendants' apartments for renters with partial subsidies.  Accordingly, the Court grants FHJC's proposed injunctive relief enjoining Defendants from:

- Denying or withholding rental apartments, or otherwise making rental apartments unavailable on the basis of disability or lawful source of income, including by applying minimum income requirements to applicants with rental subsidies or vouchers;

- Discriminating against applicants with rental subsidies or vouchers in the terms or conditions of the rental process because of disability or source of income, including by offering variances and waivers to rental criteria to non-subsidy applicants and not to subsidy applicants, and requiring rejected applicants to wait a minimum period of time before reapplying for apartments to rent; and

- Coercing, intimidating, threatening, or interfering with any person, including FHJC, on account of having aided or encouraged any other person in the exercise or enjoyment of any rights granted or protected by the FHA and the NYCHRL.

Doc 169-1 (Plaintiff's Proposed Injunction).  Additionally, Defendants shall (1) adopt

written non-discriminatory rental criteria, (2) contract with a third party to provide a fair

housing training program as outlined, (3) maintain sufficient records to verify compliance

with the terms of the injunction and make such records available to FHJC.  *Id.*

The non-discriminatory rental criteria shall not include:  a minimum gross or net

income requirement, including net rent-to-income ratios for applicants with partial pay or

100% pay rental subsidies or vouchers or minimum time periods for rejected applicants

to reapply.  *Id.*

### 2.  *Compensatory Damages*

FHJC seeks compensatory damages in the form of (1) the value of the diversion

of its resources to investigate and eliminate Defendants' discriminatory policies and

practices; and (2) the value of the injury to FHJC's mission or purpose in the form of the

future costs to monitor compliance with the injunctive order and repair for some of the

community harm caused by Defendants' policies and practices.

In support of its diversion of resources claims, FHJC has produced time records,

invoices from Dr. Steil, and testimony describing the number of hours spent on its testing

investigation of Defendants; its post-testing activities to evaluate the information it

obtained and decide how to respond to end the challenged policy and modify Defendants'

future practices; and its work during the course of this multi-year litigation including the

trial.  Also, FHJC has established its ordinary hourly billable rates at the time of its

testing investigation and seeks those same hourly rates even though the organization's

hourly rates have increased in the four years since that time.  Plaintiff's Proposed Finding

of Facts and Law ¶ 172.  The Court finds FHJC's damage award request to be reasonable,

well-documented, and consistent with the evidence presented at trial.  Accordingly, the Court awards FHJC $52,300.00 in diversion of resources compensatory damages.

FHJC also seeks future compensatory damages for frustration of mission to counteract the injury caused by Defendants to FHJC's mission and compensation for three future activities:  (1) monitoring Defendants' rental advertisements, website, and rental application records; (2) developing and distributing consumer rights information, including about housing discrimination laws, to organizations and government agencies to assist renters with rental subsidies searching for housing; and (3) conducting compliance testing of Defendants. *Id.* ¶¶ 174–77.

The Court has reviewed the testimony and exhibits by FHJC describing each of these activities and agrees with Plaintiff that they are necessary to counteract Defendants' injury to the organization and the community it serves in New York City and Westchester County where Defendants manage thousands of rental units.  The proposed hourly rates for future compliance and outreach work are based on FHJC's 2018 hourly billable rates.

Additionally, FHJC seeks frustration of mission damages for a period of five years, since Defendants instituted their discriminatory rental requirements for at least five years.  Defendants argue testing for violations of fair housing laws is part of FHJC's mission, therefore there is no interference with their mission, and damages are unwarranted.  Defendants' Proposed Finding of Facts and Law ¶ 42.  FHJC's mission is "to ensure that all people have equal access to housing opportunities in the New York City Region by eliminating housing discrimination; promoting policies and programs that foster open, accessible, and inclusive communities; and strengthening enforcement of fair housing laws."  Plaintiff's Proposed Finding of Facts and Law ¶ 3.  Conducting test calls

SPA-53

is one tool FHJC utilizes in accomplishing its mission.  Courts have held that "a defendant's act that reduces the efficiency or success of the organization's activities can be adequate" to frustrate an organization's mission.  *Hous. Rts. Initiative v. Compass, Inc.*, No. 21 Civ. 2221 (SHS), 2023 WL 1993696, at *7 (S.D.N.Y. Feb. 14, 2023), *reconsideration denied*, No. 21 Civ. 2221 (SHS), 2023 WL 2989048 (S.D.N.Y. Apr. 18, 2023).

The Court finds that the 2018 rate is reasonable and that five years of monitoring and education is appropriate, since Defendants have employed their discriminatory rental criteria for more than five years.  Accordingly, the Court orders Defendants to pay $188,240 in frustration of mission compensatory damages, for a total of $240,540 in compensatory damages.

### 3.  *Punitive Damages*

Punitive damages are available under the NYCHRL where the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the … protected rights of an aggrieved individual."  *Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 209 (S.D.N.Y. 2000).  Likewise, the FHA expressly provides for the recovery of punitive damages by plaintiffs who have suffered discriminatory housing practices.  42 U.S.C. § 3613(c)(1).

Defendants argue punitive damages are not justified because Goldfarb "did not deliberately exclude tenants with housing subsidies in the development of its 2015 Policy" and "implemented facially neutral application criteria in an attempt to make sure all applicants were treated the same."  Defendants' Proposed Finding of Facts and Law ¶ 49.  However, the Court has found that Defendants created both discriminatory policies

and practices at issue.  As described above, Defendants took no efforts to evaluate

whether the 2015 Policy complied with fair housing laws and it was only after two

lawsuits that they changed the minimum income policy for applicants with subsidies.

And although the 2019 Policy is an improvement, there are still aspects of the policy that

the Court finds questionable, such as its income calculation for applicants with partial

subsidies and its "no contact" and "insufficient voucher" designation procedures.

When determining an appropriate amount of punitive damages, the Supreme

Court has set forth three "guideposts" to consider:  (1) the reprehensible nature of the

conduct; (2) the ratio of punitive damages to compensatory damages; and (3) civil

sanctions for comparable misconduct.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575–

582 (1996).  FHJC requests $1.5 million in punitive damages.

Defendants have had ample opportunity and time to correct their policies, have

failed to do so, and thereby have acted discriminatorily toward two of the most

vulnerable populations in our society— people with disabilities and low-income renters.

Furthermore, Defendants' large size (over 6,000 apartments) and annual gross revenue of

over $72 million indicate that their discriminatory conduct affected many people.  While

the Court has found that Defendants' policies, and its 2015 Policy in particular, violated

the FHA and the NYCHRL, it finds that its efforts to remediate the violations, while

falling short, suggest its conduct was not "reprehensible."  Therefore, the Court awards

FHJC $750,000 in punitive damages.

With respect to the ratio of punitive damages, while the Supreme Court has

"rejected the notion that the constitutional line is marked by a simple mathematical

formula" the Court has indicated that a ratio of punitive damages to compensatory

SPA-55

damages of ten to one or less is generally appropriate. *Id.* at 582.  FHJC has requested $240,540 in compensatory damage, thus making $750,000 in punitive damages reasonable.

Lastly, with respect to comparable civil penalties, $750,000 is also reasonable. As of January 2018, the United States could seek a civil penalty of up to $102,606 for a first violation of the FHA (as of 2022 the number has increased to $115,054).  *See* 28 CFR  85.3(b)(3)(i).  Under the 2018 notice, the penalty then doubles to $205,211 for each subsequent violation.  28 C.F.R. 85.3(b)(3)(ii).  Thus, a $750,000 punitive damages award would reflect the maximum penalty for roughly three violations.[18]  Likewise, the City Commission can impose a penalty of up to $125,000 for any violation.  N.Y.C. Admin. Code § 8-126(a).  Again, an award of $750,000 would reflect six violations, even though it is likely that far more applicants were harmed by Defendants over the course of the 2015 Policy.

"Under well established precedent in this Circuit, it is the defendant's burden to show that his financial circumstances warrant a limitation of the award."  *Mathie v. Fries*, 121 F.3d 808, 816 (2d Cir. 1997) (citation and internal quotation marks omitted). Defendants have not proffered any evidence at trial that warrants a limitation of the award.  Accordingly, the Court orders Defendants to pay $750,000 in punitive damages to FHJC.

---

[18] The Court notes that Defendants are likely to have committed more than three violations in light of their 6,000-unit portfolio over four years.

47

SPA-56

**IV.     CONCLUSION**

For the foregoing reasons, the Court finds for the FHJC on each of its claims under the FHA and NYCHRL.  The Court also finds that the 2019 Policy is not lawful, but only as to the partial subsidy requirements.  The Court awards FHJC $240,540 in compensatory damages and $750,000 in punitive damages.  Additionally, the Court will enter an injunction against Defendants concurrently with this Opinion & Order.  The Clerk of Court is respectfully directed to enter judgment and close the case.

It is SO ORDERED.

Dated:     Setember 29, 2023
           New York, New York

_____
            Edgardo Ramos, U.S.D.J.

48