# 23-7348

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

FAIR HOUSING JUSTICE CENTER, INC.,

*Plaintiff-Appellee,*

ALFRED SPOONER,

*Plaintiff,*

—against—

PELICAN MANAGEMENT, INC., FORDHAM ONE
COMPANY, LLC., CEDAR TWO, LLC.,

*Defendant-Counter-Claimants-Appellants,*

GOLDFARB PROPERTIES, DEEGAN TWO COMPANY,

*Defendants.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

DIANE L. HOUK
SONYA LEVITOVA
EMERY CELLI BRINCKERHOFF
  ABADY WARD & MAAZEL, LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Plaintiff-Appellee*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellee discloses that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

**PAGE NO.**

TABLE OF AUTHORITIES ...................................................................iii-vi

INTRODUCTION AND STATEMENT OF THE CASE.......................................1

JURISDICTIONAL STATEMENT ............................................................3

STATEMENT OF THE ISSUES................................................................3

PROCEDURAL HISTORY....................................................................3

STATEMENT OF FACTS ....................................................................5

    I.     Rental Housing Subsidy Programs in New York.......................................5

    II.    Appellants' Unlawful Use of Minimum Income Requirements: The 2015 Policy and 2019 Policy..............................................................9

    III.   The Experts' Analyses of Appellants' Policies.......................................11

        A.   Appellants' Expert Dr. White Finds the 2019 Policy Has No Disparate Impact for All Subsidized Applicants, Inexplicably Combining Full and Partial Subsidy Applicants .............................13

        B.   FHJC's Expert Dr. Steil Finds the 2019 Policy Has an Adverse Impact on Partially Subsidized Rental Applicants ..........................15

    IV.   After Considering Both Experts' Testimony, the Court Adopts Dr. Steil's Findings ...............................................................................16

        A.   Testimony at Trial Underscores the Flaws in Dr. White's Analysis ..........................................................................16

        B.   Relying on Dr. Steil's Analysis, the Court Finds the 2019 Policy Unlawful.....................................................................20

SUMMARY OF ARGUMENT ...............................................................24

ARGUMENT ...............................................................................25

    I.     Standard of Review .................................................................25

i

II.      The District Court Did Not Commit Any Error by Treating Fully and
         Partially Subsidized Applicants Separately in Its Analysis of the 2019
         Policy's Effect ............................................................................27

III.     The District Court Did Not Commit Any Error by Including "Voucher
         Insufficient" and "No Contact" Denials in Its Analysis of the 2019
         Policy's Effect ............................................................................31

         A.      The District Court Correctly Considered "Voucher Insufficient"
                 Denials...............................................................................31

         B.      The District Court Correctly Considered "No Contact" Denials.....36

IV.      Appellants' Arguments as to the Admissibility of Dr. Steil's Testimony
         and the Propriety of Prospective Relief Are Waived ...............................39

CONCLUSION ........................................................................41

# TABLE OF AUTHORITIES

## Cases

*Albunio v. City of New York*,
16 N.Y.3d 472 (2011) ...................................................................23

*Anderson v. City of Bessemer*,
470 U.S. 564 (1985) ......................................................................25

*Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*,
945 F.3d 53 (2d Cir. 2019) ................................................ 25, 35, 37

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*,
691 F. Supp. 2d 372 (S.D.N.Y. 2009) ..........................................29

*Bogle-Assegai v. Connecticut*,
470 F.3d 498 (2d Cir. 2006) ................................................... 27, 38

*Carter-Wallace, Inc. v. Otte*,
474 F.2d 529 (2d Cir. 1972) ........................................................24

*Catanzano by Catanzano v. Wing*,
103 F.3d 223 (2d Cir. 1996) ........................................................40

*Chen v. City Univ. of N.Y.*,
805 F.3d 59 (2d Cir. 2015) ..........................................................22

*Comer v. Cisneros*,
37 F.3d 775 (2d Cir. 1994) ..................................................... 11, 12

*E.E.O.C. v. Sears, Roebuck & Co.*,
839 F.2d 302 (7th Cir. 1988) .......................................................26

*Eidinger v. PRIMMA, LLC*,
No. 19-cv-3219, 2022 WL 17685444 (E.D.N.Y. Nov. 1, 2022) ...................29

*Esso Standard Oil Co. v. S. S. Kaposia*,
259 F.2d 486 (2d Cir. 1958) ........................................................24

*Greene v. United States*,
13 F.3d 577 (2d Cir. 1994) ..........................................................27

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
    826 F.3d 27 (2d Cir. 2016) ...........................................................40

*Hazelwood Sch. Dist. v. United States*,
    433 U.S. 299 (1977)......................................................................36

*Langlois v. Abingdon Hous. Auth.*,
    207 F.3d 43 (1st Cir. 2000)..........................................................12

*Lowe v. Commack Union Free Sch. Dist.*,
    886 F.2d 1364 (2d Cir. 1989) .......................................................29

*McReynolds v. Sodexho Marriott Servs., Inc.*,
    349 F. Supp. 2d 1 (D.D.C. 2004)..................................................28

*Meacham v. Knolls Atomic Power Lab'y*,
    461 F.3d 134 (2d Cir. 2006) .........................................................28

*Merck Eprova AG v. Brookstone Pharms., LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013) .........................................16

*Mhany Mgmt., Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ................................................. 22, 23

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) .........................................................23

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir. 1998) .........................................................38

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
    875 F.2d 365 (2d Cir. 1989) .........................................................26

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018) ........................................................37

*Roberts v. Royal Atl. Corp.*,
    542 F.3d 363 (2d Cir. 2008) .........................................................24

*Sacerdote v. N.Y. Univ.*,
    9 F.4th 95 (2d Cir. 2021) ..............................................................25

*Schaffer ex rel. Schaffer v. Weast*,
    546 U.S. 49 (2005) ....................................................................16

*Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*,
    82 F.4th 144 (2d Cir. 2023) .................................................. 25, 37

*Smith v. Xerox Corp.*,
    196 F.3d 358 (2d Cir. 1999) ......................................................28

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015) ..................................................................37

*Tsombanidis v. W. Haven Fire Dep't*,
    352 F.3d 565 (2d Cir. 2003) ......................................................29

*United States v. Braunig*,
    553 F.2d 777 (2d Cir. 1977) ......................................................27

*United States v. Yonkers Bd. of Educ.*,
    837 F. 2d 1181 (2d Cir. 1987) ...................................................39

*Waisome v. Port Auth. of N.Y. & N.J.*,
    948 F.2d 1370 (2d Cir. 1991) ....................................................25

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................27

*Wharff v. State Univ. of N.Y.*,
    413 F. App'x 406 (2d Cir. 2011) ...............................................29

*Williams v. Remus Mgmt. Grp., LLC*,
    836 F. Supp. 2d 159 (S.D.N.Y. 2011) .......................................22

*Woodbury v. N.Y.C. Transit Auth.*,
    832 F.2d 764 (2d Cir. 1987) ................................................ 35, 37

*Zhang v. Gonzales*,
    426 F.3d 540 (2d Cir. 2005) ......................................................38

**Statutes**

28 U.S.C. § 1331 ................................................................................3

28 U.S.C. § 1367 ................................................................................3

28 U.S.C. § 2201 ..................................................................3

42 U.S.C. § 3604 ..................................................................4

42 U.S.C. § 3613 ................................................................39

N.Y.C. Admin. Code § 8-107 ..............................................4

N.Y.C. Admin. Code § 8-502 ............................................39

## Rules

Fed. R. Civ. P. 13 .................................................................3

Fed. R. Evid. 702 ...............................................................38

## Regulations

24 C.F.R. § 100.500 ..........................................................23

## Other Authorities

*CityFHEPS*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024),
    https://perma.cc/9YN5-7MPX; ........................................8

*FHEPS*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024),
    https://perma.cc/2ARH-2DCH .........................................8

N.Y.C. Hum. Res. Admin., *FHEPS Fact Sheet* (Jan. 3, 2024),
    https://perma.cc/3E2L-H7G2 ...........................................8

N.Y.C. Hum. Res. Admin., *HASA Facts* (Mar. 2024),
    https://perma.cc/F7WV-2GYH ..........................................7

*SOTA*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024),
    https://perma.cc/BH34-S6HM ...........................................8

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff-Appellee Fair Housing Justice Center, Inc. ("FHJC") is a non-profit civil rights organization dedicated to ensuring that all people have equal access to housing opportunities in the New York City region. After receiving a discrimination complaint from a renter with a disability-based rental subsidy, FHJC conducted an undercover fair housing testing investigation of Defendant-Appellant Pelican Management, a large New York landlord managing approximately 6,000 rental units in New York City and suburban Westchester County ("Goldfarb Properties," Pelican Management's public-facing name).[1] FHJC then filed this lawsuit against Goldfarb Properties alleging discrimination based on disability and source of income, in violation of the Fair Housing Act ("FHA") and the New York City Human Rights Law ("HRL"). At the time, Goldfarb Properties used rental criteria that included a facially neutral minimum income requirement. Its policy excluded 97% of potential applicants with rental subsidies—applicants who are disproportionately 2.5 times more likely to have a household member with a disability than renters without subsidies in New York City and Westchester County.

---

[1] *See* JA 429-30. Defendants-Appellants Fordham One Company LLC and Cedar Two Company LLC are the ownership entities for two Goldfarb-operated rental buildings. JA 463-65.

In 2019, near the close of fact discovery, Goldfarb Properties changed its rental criteria (the "2019 Policy") and filed a counterclaim for a declaratory judgment as to the new policy's lawfulness. After a bench trial, the district court found that Goldfarb Properties' original policy violated the FHA and HRL and ordered damages and injunctive relief for FHJC. The court also found for FHJC on Goldfarb Properties' counterclaim, holding that the 2019 Policy was unlawful as to its requirements for applicants with partial subsidies (*i.e.*, applicants with rental subsidies that pay some of their rent, but not all of it, directly to their landlords). The court reached this holding after carefully weighing the testimony and analyses of the parties' respective experts and concluding that the 2019 Policy caused an adverse disparate impact on partially subsidized applicants. On appeal, Goldfarb Properties challenges only this ruling.

The matter before the Court is simple: whether the district court's findings of fact as to the 2019 Policy's disparate impact on partially subsidized applicants should be disturbed. Under the clear-error standard of review, the answer is no. The district court was well within its rights to determine which expert's testimony it found more convincing, and to adopt that expert's analysis accordingly. Goldfarb Properties' other arguments—about the admissibility of FHJC's expert's testimony and the propriety of prospective relief—have been waived, and they fail on the merits regardless. The district court's judgment should be affirmed.

2

## JURISDICTIONAL STATEMENT

FHJC agrees that the district court had jurisdiction of FHJC's claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. The district court had jurisdiction of Goldfarb's counterclaim under the Declaratory Judgment Act pursuant to 28 U.S.C. § 1367, Fed. R. Civ. P. 13(a), and 28 U.S.C. § 2201.

## STATEMENT OF THE ISSUES

Whether the district court (Ramos, J.) clearly erred in making certain factual findings that formed the basis for concluding Appellants' 2019 minimum income requirement for partial rental subsidy applicants was unlawful and, thus, Appellants were not entitled to judgment on their counterclaim under the Declaratory Judgment Act.

## PROCEDURAL HISTORY

In 2017, Alfred Spooner, a disabled homeless man with a rental voucher, filed a housing discrimination complaint with FHJC alleging that Goldfarb Properties had refused to rent two different apartments to him, even though the apartments' rents were within the voucher program's rent payment standard. JA 30. At the time, Goldfarb Properties' rental policy (the "2015 Policy") required a minimum gross income that effectively foreclosed applicants with rental subsidies from renting apartments in its buildings. JA 31, 1120-21, 1125-31. In response to Mr. Spooner's complaint, FHJC directed testers to inquire about apartments advertised for rent at

various buildings managed by Goldfarb, and ultimately confirmed Goldfarb's policy and practices. JA 31.

In early 2018, FHJC and Mr. Spooner sued Goldfarb Properties, alleging that the 2015 Policy violated the FHA, 42 U.S.C. § 3604(f)(1), and the HRL, N.Y.C. Admin. Code § 8-107(5)(a). *See* JA 30-52. The complaint challenged the 2015 Policy as discriminating against Olmstead, HASA, and Section 8 voucher holders based on disability (violating the FHA and HRL) and source of income (violating the HRL). JA 45-46; see *infra* at 6-8 for description of the three subsidy programs.

After fact discovery was completed, the parties stipulated to the filing of a second amended complaint in 2019,[2] 18-cv-1564 ECF No. 85, which continued to allege that the 2015 Policy violated the FHA and HRL, JA 120-25. Goldfarb's answer alleged, for the first time, that it had recently changed its rental criteria (the "2019 Policy") and asserted a counterclaim against FHJC under the Declaratory Judgment Act: specifically, Goldfarb sought a "declaration that [the 2019 Policy] does not constitute unlawful discrimination against persons with disabilities or . . . on the basis of source of income." JA 148.

---

[2] The parties also stipulated to dismiss Mr. Spooner's individual claims with prejudice after his claims were resolved through settlement. JA 99-100, 1517. He is listed as a plaintiff on the cover of this brief solely to comply with this Court's caption, but he was terminated as a plaintiff by the district court on May 2, 2019. *See* 18-cv-1564 ECF No. 75.

The court held a bench trial in 2022 on the parties' respective claims. On September 29, 2023, the court entered judgment for FHJC on each of its claims under the FHA and HRL, awarding $240,540 in compensatory damages and $750,000 in punitive damages. SPA 53. The court also ruled against Goldfarb Properties on its counterclaim. Contrary to Appellants' claim on this appeal, the court held that the 2019 Policy was not lawful as to partial subsidy applicants. SPA 1. *Contra* Br. for Defs.-Counter-Claimants-Appellants ("Appellant Br.") at 21 ("[T]he Court . . . [found] that the 2019 Policy was lawful[.]"). The court also ordered injunctive relief against Goldfarb Properties, consistent with FHJC's proposed injunction. *See* SPA 2-3; JA 1593-94. As relevant to this appeal, Section 1(a) of the injunction prohibits Goldfarb Properties from discriminating against any person based on lawful source of income in violation of the HRL, including by applying minimum income requirements to applicants with rental subsidies or vouchers. SPA 2-3. Goldfarb's appeal followed.

## STATEMENT OF FACTS

## I.   RENTAL HOUSING SUBSIDY PROGRAMS IN NEW YORK

Housing subsidies, including rental vouchers, are created by federal, state, and local governments to help low- and moderate-income households, people with disabilities, and other vulnerable groups to obtain stable housing in the private rental market. JA 1105. Some of the programs provide full rental subsidies and pay 100%

of the tenant's rent directly to the landlord. JA 173, 1105-06. Others, called partial rental subsidies, pay a portion of the rent to the landlord with the tenant paying the balance, typically approximately 30% of the tenant's income. JA 173, 1105-06. Each program sets maximum rent amounts based, among other criteria, on the number of bedrooms in an apartment, for which there are exceptions. *See* JA 173-74, 1028, 1112, 1415. And each program evaluates a renter's income to determine their eligibility for a rental subsidy and the amount of rent they can be expected to pay, if any. JA 1106.

Goldfarb Properties' counterclaim is based on its assertion that the 2019 Policy did not illegally discriminate against renters with any of six housing subsidy programs operating at that time in New York City: Section 8, HIV/AIDS Services Administration ("HASA"), Olmstead Housing Subsidy ("Olmstead"), Family Homelessness and Eviction Prevention Supplement ("FHEPS"), City Fighting Homelessness and Eviction Prevention Supplement ("CityFHEPS"), and Special One-Time Assistance ("SOTA"). Appellant Br. at 12.

The largest of these programs, Section 8, is funded by the U.S. Department of Housing and Urban Development ("HUD") and administered by local agencies that provide rental vouchers to income-eligible households. JA 168-69. In 2018, at least 139,000 households in New York City and Westchester County, where Goldfarb

Properties operates rental buildings, used Section 8 vouchers to pay some or all of their rent. JA 168-69, 1113-14.

Households are generally eligible for Section 8 if their income is 50% or less of the median income for the county or metropolitan area where they live. JA 1121. Once approved for the program, renters search for apartments within each program's maximum rent payment standard, subject to certain exceptions.[3] JA 176, 1108-09. Once a program participant rents an apartment, the administering agency pays the program's share of the rent directly to the landlord. JA 461-63, 676. If the tenant's income changes during their tenancy, their share of the rent is adjusted up or down to ensure that the tenant is not paying more than approximately 30% of their adjusted monthly income as determined by the administering agency.[4] JA 171-72.

HASA, operated by New York City, provides a variety of public benefits, including rental subsidies, to low-income people living with HIV or AIDS. JA 169, 1027. As of January 2024, 19,484 renters were HASA clients receiving a rental

---

[3] For example, one exception in the Section 8 program is the 40% Rule, whereby tenants may secure an apartment with rent above the rent payment standard and pay more than 30% of their income towards the monthly rent so long as the tenant's rent share is not more than 40% of their adjusted gross monthly income. JA 175-76.

[4] The Section 8 program adjusts a tenant's gross monthly income to account for disabilities, children under 18, and certain medical and/or childcare expenses. JA 174, 1143.

subsidy.[5] HASA rental subsidies may either pay 100% of the rent or a portion of the rent depending on the renter's income, and approximately half of HASA clients have 100% pay vouchers. JA 173. Like Section 8, HASA pays the program's share of the rent directly to the landlord. JA 170, 1029.

New York State's Olmstead Housing Subsidy ("Olmstead") provides a rental subsidy to low-income individuals who are eligible for nursing home care but who may, with supportive services, be able to live independently in a home or apartment. JA 169, 1115. Olmstead operates similarly to Section 8. JA 34, 1116.

FHEPS and CITYFHEPS are New York City rental voucher programs that offer both 100% pay and partial pay rent assistance.[6] JA 1453. The purpose of both FHEPS and CITYFHEPS is to assist households at risk of homelessness or at risk of entering or staying in a shelter. *See supra* n.6.

Finally, SOTA is a one-time rent grant for income-eligible renters in New York City.[7] SOTA is not like the other five programs, Section 8, HASA, Olmstead,

---

[5] N.Y.C. Hum. Res. Admin., *HASA Facts* (Mar. 2024), https://perma.cc/F7WV-2GYH.

[6] *FHEPS*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024), https://perma.cc/2ARH-2DCH; *CityFHEPS*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024), https://perma.cc/9YN5-7MPX; N.Y.C. Hum. Res. Admin., *FHEPS Fact Sheet* (Jan. 3, 2024), https://perma.cc/3E2L-H7G2.

[7] *SOTA*, N.Y.C. Hum. Res. Admin. (last visited Apr. 26, 2024), https://perma.cc/BH34-S6HM.

FHEPS, or CITYFHEPS, because it does not provide ongoing rental assistance for as long as the household is eligible. *See supra* n.7.

## II.  APPELLANTS' UNLAWFUL USE OF MINIMUM INCOME REQUIREMENTS: THE 2015 POLICY AND 2019 POLICY

In 2015, shortly after entering into a settlement agreement not to discriminate against prospective renters based on lawful source of income, Goldfarb Properties established the 2015 Policy, a company-wide policy with a minimum income requirement for rental applicants. SPA 15-16. The key provision of the policy required applicants to have a gross annual income equal to 43 times the full monthly rent, even if the applicant had a rental subsidy that would pay some or all their rent. SPA 16; JA 1117. When calculating an applicant's monthly income, Goldfarb Properties applied its own definitions and assumptions as opposed to accepting the income evaluation conducted by an applicant's rental subsidy program. SPA 19-20; JA 329-30, 1117. The district court ultimately held that the 2015 Policy violated the FHA and HRL based on disability and source of income. SPA 37-38, 41, 44.

In 2019, shortly before fact discovery was set to close, Goldfarb began to implement the 2019 Policy, a revised rental policy with three components. SPA 18; JA 872. First, for applicants with no rental subsidy, the criteria remained the same as before. Second, for applicants with a *full* subsidy (*i.e.*, 100% of the rent is paid by a government program), the 2019 Policy eliminated all income-related requirements. JA 872. And third, for applicants with a *partial* subsidy (*i.e.*, a portion, but not all

the rent, is paid by a government program), the 2019 Policy lowered the gross annual income requirement from 43 to 40 times the tenant's share of the monthly rent, rather than the full rent. JA 872. Additionally, partial subsidy applicants had to have a monthly net rent-to-income ratio of no more than 40% of their share of the rent.[8] SPA 19; JA 872. If Goldfarb Properties could not determine the tenant's portion of the rent from the face of the application, it generally assumed the tenant's share to be 30% of the tenant's gross income, even though the tenant's actual rent share might have been lower due to housing program income deductions. JA 1142; *see supra* n.4. The 2019 Policy thus applied three distinct criteria to three different groups of applicants: unsubsidized applicants, partially subsidized applicants, and fully subsidized applicants.

When considering applications under the 2019 Policy, Goldfarb Properties denied them for the following reasons: *voucher insufficient* (where Goldfarb determined an available apartment's rent was outside the amount the applicant's subsidy allowed), *no contact* (where Goldfarb could not reach an applicant for

---

[8] For example, for Section 8 voucher holders, Goldfarb did not use the program's adjusted gross income formula. SPA 19; *see supra* n.4. Instead, it calculated an applicant's adjusted gross income by looking at their net income and deducting only any payable taxes, effectively assuming that a Section 8 voucher holder's share of the rent is higher than it actually is. SPA 20.

further communications), *credit insufficient*, *income insufficient*, and *not qualified*.[9]
JA 1154-55, 1349.

## III. THE EXPERTS' ANALYSES OF APPELLANTS' POLICIES

Both parties engaged expert witnesses to analyze the adverse impact of Goldfarb's policies. FHJC's expert witness was Dr. Justin Steil, an MIT professor of law and urban planning whose work has focused on housing policy and housing discrimination. JA 1103-04, 1160-63. Goldfarb Properties' expert witness was Dr. Paul White, a labor and employment economist who had never conducted a disparate impact analysis in the housing context or otherwise done any analysis with respect to rental housing markets. JA 648-49, 711-12, 1367.

For FHJC's claim regarding Goldfarb's 2015 Policy, Dr. Steil testified at trial that only 3% of Section 8 households in New York City and Westchester County would pass Goldfarb's minimum income requirement, and *no* Olmstead or HASA households could satisfy the 2015 Policy.[10] JA 1120-21, 1125-31.

---

[9] Applications could also be marked as duplicates, pending, or canceled. JA 1145, 1154, 1348.

[10] Dr. Steil evaluated the 2015 Policy's effect on Section 8, Olmstead, and HASA voucher holders only, given that those were the three housing assistance programs at issue in FHJC's original suit. *See* JA 45-46, 1120.

Dr. Steil then testified that the 2015 Policy caused an adverse impact based on source of income.[11] He drew his conclusion from the results of two tests he utilized for his analysis: the *Comer* test and the "four-fifths" test.[12] Under either test, Dr. Steil found that the 2015 Policy disproportionately excluded, to a statistically significant degree, households that used rental subsidies. JA 1128-30, 1138.

For Goldfarb Properties' counterclaim regarding the 2019 Policy, the parties engaged the same two experts. Goldfarb Properties' expert witness, Dr. White, prepared a report that reviewed apartment application data from May 1, 2019, to August 31, 2020, and analyzed the effects of the 2019 Policy on Goldfarb Properties' denial rate of applicants with a subsidy as compared to those without a subsidy. *See*

---

[11] Dr. Steil also testified at trial that the 2015 Policy caused a disparate impact based on disability, a finding not at issue in this appeal.

[12] In *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994), this Court assessed the disparate impact of a residency preference policy by comparing the percentage of minority families holding Section 8 vouchers with the percentage of minorities on the waiting list for housing. *Id.* at 793. The *Comer* court found, for purposes of a standing analysis, that the residency preference policy was racially discriminatory because it effectively "[gave] subsidies to a disproportionate number of white suburban residents ahead of minority city dwellers." *Id.* at 792.

The "four-fifths" test was adopted from the Equal Employment Opportunity Commission ("EEOC") and used in a First Circuit FHA case to determine whether a difference in selection rates constitutes disparate impact. *See Langlois v. Abingdon Hous. Auth.*, 207 F.3d 43, 50 (1st Cir. 2000). Under the four-fifths test, there is a disparate impact when the selection rate for any protected group is less than four-fifths, or 80%, of the selection rate for the group with the highest selection rate. *Id.*

SPA 22; JA 1339-1404. Dr. Steil then conducted a rebuttal analysis of Dr. White's report. *See* JA 1102-97.

### A. Appellants' Expert Dr. White Finds the 2019 Policy Has No Disparate Impact for All Subsidized Applicants, Inexplicably Combining Full and Partial Subsidy Applicants

As the counterclaimant, Goldfarb Properties had the burden to prove that the 2019 Policy was lawful. To do so, Goldfarb Properties engaged Dr. White to evaluate data that it assembled without his direction or review. JA 651, 654-55. Even though Dr. White acknowledged that the 2019 Policy "define[d] three application types and set[] different standards for each type," he nevertheless—and with no explanation—considered the denial rates of voucher holders as a single class, regardless of whether their subsidy was full or partial. JA 1346. Additionally, Dr. White excluded from his analysis two distinct groups of applications denied by Goldfarb Properties: "no contact" denials and "voucher insufficient" denials. JA 1349; see *supra* at 10-11 for list of denial reasons. His rationale, based on data collected by Goldfarb Properties without direction from Dr. White and without his independent analysis of any underlying documentation, was that those reasons were based on the *applicant*'s action of either "not returning" Goldfarb Properties' attempts to contact them or applying to apartments with a rent higher than the amount allowed by their voucher. JA 1349-50.

13

Dr. White compared the actual denial rates observed in Goldfarb Properties'
data to "the expected outcome" that would be observed "if voucher-holders'
applications were denied for income or credit at a rate approximately equal to the
denial rate for applicants who did not have a voucher." JA 1352. He also assumed
without explanation that applicants would be denied in the same proportion that they
constituted relative to the full rental applicant pool in New York City and
Westchester County. JA 1352 ("As a hypothetical example in the context of housing
vouchers, if [subsidized] applications constitute 5% of all applications within the
relevant time frame, all else being equal, then in a neutral process, I would expect
that approximately 5% of those who were denied based on income or credit are
[subsidized] applications."). Rather than considering the actual effect of the 2019
Policy on partially and fully subsidized applicants, and without controlling for the
key factor of applicants having a partial or full rental subsidy, many of the
comparisons that Dr. White conducted isolated the effects of certain denial reasons
on particular program users. For example, he tested the impact of the 2019 Policy's
"income insufficient" criterion only on Section 8 voucher holders, and the "credit
insufficient" criterion only on HASA voucher holders only. *See* JA 1351. Dr. White
concluded that, under the 2019 Policy, all subsidized applicants combined were not
denied significantly more than expected when compared to non-subsidized
applicants. JA 1342.

**B.** **FHJC's Expert Dr. Steil Finds the 2019 Policy Has an Adverse Impact on Partially Subsidized Rental Applicants**

Goldfarb Properties' assertion in its brief that FHJC "pick[ed] out" certain rental subsidy programs for analysis of the impact of the 2019 Policy is simply false. Appellant Br. at 12-15. Because Goldfarb Properties presented its counterclaim as seeking a determination encompassing six rental subsidy programs, Section 8, Olmstead, HASA, FHEPS, CityFHEPS, and SOTA, Dr. Steil analyzed the 2019 Policy's effect on Goldfarb applicants participating in all these programs, using Goldfarb Properties' self-selected data to do so. JA 1144.

 The data provided by Goldfarb Properties included all rental applicants for a 15-month period after the 2019 Policy went into effect, indicating whether each applicant received a subsidy and, if so: the type of subsidy; the rent amount of the apartment Goldfarb Properties had available at the time the application was completed; whether the applicant was accepted or rejected; and—if rejected—the reason for the denial. JA 339, 1144-45, 1458-59.

Given the 2019 Policy's three distinct minimum income requirements for non-subsidized, partially subsidized, and fully subsidized applicants, Dr. Steil considered each specific requirement and its effect on each type of applicant group separately. JA 1148, 1154. He used Goldfarb Properties' determination of whether an application was fully or partially subsidized. JA 1154-55. He also included in his

analysis every reason that Goldfarb Properties listed for denying an applicant, other than "Duplicate." JA 1145, 1149, 1154-55; *see supra* at 10-11.

Using Goldfarb Properties' own data, Dr. Steil found that Goldfarb Properties approved 30% of non-subsidized applicants and 53% of fully subsidized applicants. JA 1155. Given that fully subsidized applicants did not have to satisfy any income or credit score criteria, their relatively high approval rate was to be expected. JA 1155. But only 13% of *partially* subsidized applicants were approved, less than half the 30% rate of non-subsidized applicants. JA 1155-56. According to Dr. Steil, that difference in approval rates was statistically significant and indicated that the 2019 Policy had a substantial adverse impact on applicants with partial subsidies. JA 1156. Even excluding "no contact" denials, Goldfarb Properties only approved 20% of partially subsidized applicants, just two-thirds of the 30% approval rate for non-subsidized applicants, also a statistically significant difference in approval rates. JA 1156. As a result, Dr. Steil concluded that the 2019 Policy had a substantial adverse impact on partial subsidy applicants based on source of income. JA 1157.

## IV. AFTER CONSIDERING BOTH EXPERTS' TESTIMONY, THE COURT ADOPTS DR. STEIL'S FINDINGS

### A. Testimony at Trial Underscores the Flaws in Dr. White's Analysis

As the counterclaimant seeking declaratory judgment of the 2019 Policy's legality, it was Goldfarb's burden at trial to prove that the 2019 Policy did not discriminate against partial subsidy applicants. *See Schaffer ex rel. Schaffer v.*

*Weast*, 546 U.S. 49, 57-58 (2005) (concluding that "the burden of persuasion . . . usually falls[] upon the party seeking relief"); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 415 (S.D.N.Y. 2013).

After considering the testimony of both expert witnesses, the court rejected Dr. White's analysis and adopted Dr. Steil's findings, incorporating Dr. Steil's critiques of Dr. White's analysis. First, Dr. Steil testified that Dr. White's premise that equal rates of approval overall for all subsidized and non-subsidized applicants, combined, demonstrated a lack of adverse impact, *see* JA 1352, was faulty because all subsidized applicants are not similarly situated to all non-subsidized applicants in terms of their ability to pay their portion of the rent, *see* JA 1146-47. Most program participants are required to pay roughly 30% of their adjusted gross income towards rent. [13] Renters who pay 30% of their income toward rent, by definition, earn 40 times the rent, so subsidized applicants have gross incomes near Goldfarb Properties' 2019 minimum income requirements. JA 1146-47. Dr. White's decision to compare those subsidized applicants to *all* non-subsidized applicants, who have a wide range of incomes relative to their prospective rent, judged "apples against

---

[13] For example, if a voucher holder's gross annual income is $12,000 and their monthly share of the rent is 30 percent of their income, then their expected monthly payment is $300 (($12,000/12 months)*(0.3)) with the remainder of the rent paid by the rental subsidy program. Forty times their monthly rent contribution is $12,000. JA 1151.

17

oranges": the two groups were non-equivalent, and their outcomes non-comparable. JA 1147. Instead, the logical comparison was of denial rates for subsidized and non-subsidized applicants with similar "rent to income" ratios, something Dr. White did not do. JA 554.

Additionally, Dr. Steil criticized Dr. White's analysis of the 2019 Policy as applied to all subsidized applicants combined, without distinguishing whether they were fully or partially subsidized, even though the 2019 Policy applied different requirements to the two different groups of applicants. JA 1148. According to Dr. Steil, this decision skewed Dr. White's results. For instance, fully subsidized applicants did not have to satisfy any income or credit criteria, so one would expect Goldfarb Properties to approve them at a relatively high rate. JA 1149. Despite this key difference, Dr. White grouped fully subsidized applicants with partially subsidized applicants who faced strict income and credit requirements. JA 1149.

Finally, Dr. Steil testified that Dr. White's analysis improperly excluded certain denial reasons, specifically "voucher insufficient" and "no contact" denials. JA 1149. As Dr. Steil pointed out, Dr. White improperly assumed that "voucher insufficient" denials always occurred because the applicant sought an apartment with a rent higher than the amount permitted by their voucher program. JA 1150. Dr. White conceded at trial that Goldfarb Properties had the discretion to consider certain factors when denying an application as "voucher insufficient": what rent

18

amount to use (the rent for the unit applied for or the rent for a comparable unit if the original unit was unavailable), what amount of the total rent the subsidy program would pay (which depended on the program), and whether—as explicitly contemplated by Section 8—the applicant may be able to afford to contribute more to the rent than their expected share (up to 40% of their income instead of 30%). JA 662; *see* JA 1028, 1150. As conceded by Dr. White, he did not verify whether Goldfarb Properties had correctly determined the rent limit of any applicant's subsidy. JA 654-55, 659. Instead, Dr. White assumed a "voucher insufficient" denial meant that a renter had applied for an apartment with rent above their program's limits and excluded "voucher insufficient" denials altogether. JA1150. By doing so, he omitted the reason that Goldfarb Properties denied *more than one out of every four* subsidized applicants and distorted the statistical effects of the 2019 Policy. JA 1150.

Similarly, as Dr. Steil explained, "no contact" denials were a product of actions both by applicants and Goldfarb Properties—and, at trial, Goldfarb witnesses (including Dr. White) agreed that leasing agents have discretion as to when to contact an applicant, how many attempts to make, what time of day to attempt contact, and when to declare that applicant "no contact." JA 330-31, 662-63, 1150. Goldfarb Properties produced no records at trial about its agents' practices, and Dr. White testified that he was unaware of any specific rules governing Goldfarb agents'

19

discretion in contacting applicants. JA 330-31, 662-63. Moreover, Goldfarb Properties denied *three in ten*, or 30% of subsidized applicants for "no contact," at a much higher rate than it did non-subsidized applicants for the same reason (only 14%). JA 1151. This raised the question of whether Goldfarb agents made less effort to contact subsidized applicants than non-subsidized applicants. JA 1151.

### B. Relying on Dr. Steil's Analysis, the Court Finds the 2019 Policy Unlawful

Having heard hours of in-person expert testimony and reviewed voluminous expert affidavits, the court found that: (1) Dr. Steil was correct to treat applicants with partial subsidies and those with full subsidies as distinct groups for purposes of analyzing the 2019 Policy's effect; (2) it was appropriate for Dr. Steil to include subsidized applicants in his 2019 Policy analysis who were denied as "voucher insufficient"; and (3) it was similarly appropriate for Dr. Steil to include subsidized applicants in that analysis who were denied for "no contact." SPA 30-34.

In its opinion, the court described the support in the trial record for each of those conclusions. First, based on its review of the 2019 Policy's differing requirements for fully versus partially subsidized applicants (the former were not subjected to income or credit requirements; the latter were), the court found that the two groups should be treated separately for purposes of analyzing the policy's effect. SPA 30.

Second, noting that whether to include "voucher insufficient" denials was "pivotal," the court explained that it was not necessarily true that such denials *only* occurred because a renter applied to an apartment with a higher rent than the subsidy program would approve. SPA 31. Rather, as witnesses testified at trial, Goldfarb had the discretion to—and did—consider certain factors when determining whether a voucher was sufficient. For example, under the 2019 Policy, Goldfarb could decide what rent amount to use in its calculations: the rent for the unit applied for or the rent for another comparable available unit.[14] JA 334-35, 338-39 (Goldfarb employee testified that when an apartment a renter applied for was no longer available, denials for "voucher insufficient" were based on the rent of another available apartment in the building, not the apartment applied for). Goldfarb Properties could also consider whether the applicant's subsidy program had discretion to pay a higher amount towards rent than the rent payment standard. JA 557. And, as explicitly contemplated by Section 8, Goldfarb could consider whether the applicant could afford to contribute more than their expected share of the rent and therefore pay a rent higher than the program's rent payment standard. JA 1455-56 (one Goldfarb employee

---

[14] Goldfarb Properties provided no evidence that its agents told applicants about available apartments in other buildings, even though it manages thousands of apartments across New York City and Westchester County. JA 184, 1090, 1522.

testified that the company "takes account of [this] option" but provided no instructions to its leasing agents or documentation of any agent doing so).

Third, the court found that it was appropriate to include "no contact" denials in the analysis for several reasons. Goldfarb's agents had discretion as to when to contact an applicant, how many to attempts to make, what time of day to attempt contact, what means to use for contact—and when to decide that an applicant could officially be categorized as "no contact." SPA 33; JA 330-31 (Goldfarb employee testified as such). Additionally, Goldfarb Properties' witnesses agreed that they were not aware of any written guidance for Goldfarb agents regarding contact attempts or how long to wait before categorizing an applicant as "no contact," and Goldfarb produced no records at trial showing the denials' basis. SPA 33; JA 330-31, 662-63. Finally, the court agreed that the large difference in "no contact" denials between subsidized and non-subsidized applicants that Dr. Steil identified (30% versus 14%) raised the question of *why* that rate was so different. SPA 33; JA 1155.

Having made those findings, the court adopted Dr. Steil's conclusion that there was a statistically significant difference in Goldfarb's denial rate of applicants with no subsidy compared to applicants with partial subsidies. SPA 33-34.

To determine whether the 2019 Policy was justified despite the disparate impact it caused, the court then proceeded to the burden-shifting framework that is generally used to evaluate disparate impact claims brought under the FHA and HRL.

SPA 34, 38; *see Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75-76 (2d Cir. 2015) (noting that courts have approached HRL claims using a framework "similar" to that for equivalent federal discrimination claims); *Williams v. Remus Mgmt. Grp., LLC*, 836 F. Supp. 2d 159, 171 (S.D.N.Y. 2011) (same).

Under this three-step process, the party asserting illegal housing discrimination under a disparate impact theory of liability must prove (1) the occurrence of certain outwardly neutral practices and (2) a significantly adverse or disproportionate impact on a group of people "of a particular type" produced by the opposing party's facially neutral acts or practices. *Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016). Once these two elements are established, in the housing discrimination context, the burden shifts to the opposing party to "prov[e] that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests[.]'"[15] *Id.* (quoting 24 C.F.R. § 100.500(c)(1)-(2)). HRL discrimination claims are analyzed using this same test, but in so doing, courts must construe the HRL's provisions "liberally" and "broadly in

---

[15] If the opposing party proves the necessity of the challenged practice, then the party asserting discrimination must show that the "substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* (citing 24 C.F.R. § 100.500(c)(3)). The district court did not reach this third step of the framework because it held that Goldfarb Properties failed to meet its burden at the second step. SPA 41.

favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78 (2011)).

Adopting Dr. Steil's findings as to the 2019 Policy, the court concluded that FHJC had demonstrated disparate impact, and noted, in particular, that when all denial reasons were considered, Goldfarb approved 30% of non-subsidized applicants as compared to only 13% of partially subsidized applicants, "a statistically significant adverse difference." SPA 48. To withstand this finding, Goldfarb needed to prove that the 2019 Policy was necessary to achieve its claimed interest, "assessing the ability of applicants [] to pay the rent." SPA 37, 48. Goldfarb failed to do so: it offered no evidence reflecting that partial subsidy holders could not pay their portion of the rent absent the 2019 Policy, and no evidence "reflecting that partial subsidy holders are unlikely to pay the portion of their rent that their programs have deemed them qualified to pay." SPA 48. Thus, the court found the 2019 Policy unlawful under the HRL as to its requirements for applicants with partial subsidies. SPA 48.

## SUMMARY OF ARGUMENT

The district court did not commit any error, let alone clear error, by adopting Dr. Steil's findings because Dr. Steil: (1) correctly analyzed the 2019 Policy's effect on partial subsidy applicants separately from its effect on full subsidy applicants,

and (2) properly included "voucher insufficient" and "no contact" denials in the analysis. Goldfarb's other arguments about the admissibility of Dr. Steil's testimony and the propriety of prospective relief have long been waived—and, in any event, fail on the merits.

## ARGUMENT

### I. STANDARD OF REVIEW

On appeal from a judgment after a bench trial, this Court reviews the district court's findings of fact for clear error. *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 367 (2d Cir. 2008). A district court's consideration of expert testimony in making factual findings is also subject to this standard of review. *See Carter-Wallace, Inc. v. Otte*, 474 F.2d 529, 547 (2d Cir. 1972); *Esso Standard Oil Co. v. S. S. Kaposia*, 259 F.2d 486, 487 (2d Cir. 1958) ("The only questions presented for our decision are whether certain findings of fact, which are basic to the decision and which rest largely on the district court's evaluation of expert testimony, are clearly erroneous[.]").

The clear error standard requires that this Court "accept a district court's factual findings unless '[it is] left with the definite and firm conviction that a mistake has been committed.'" *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153 (2d Cir. 2023) (quoting *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 119 (2d Cir. 2021)). Clear error may occur if the district court "points to no evidence

whatsoever" to substantiate its finding of fact, or if the finding is "contradicted by incontrovertible evidence." *Id.* But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety," the Court "may not reverse it." *Id.* (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573-74 (1985)). Where a district court's findings are "extensive" and "support[ed] in the record," there is no clear error. *Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.*, 945 F.3d 53, 69 (2d Cir. 2019).

"Statistical evidence may be probative [of disparate impact] where it reveals a disparity so great that it cannot be accounted for by chance." *Waisome v. Port Auth. of N.Y. & N.J.*, 948 F.2d 1370, 1375 (2d Cir. 1991). "Especially in cases where statistical evidence is involved, 'great deference is due the district court's determination of whether the resultant numbers are sufficiently probative of the ultimate fact in issue." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 374 (2d Cir. 1989) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 310 (7th Cir. 1988)).

Goldfarb Properties challenges two of the district court's factual determinations, both involving its adoption of Dr. Steil's analysis and statistical findings over Dr. White's: treating fully and partially subsidized applicants separately in analyzing the 2019 Policy's effect and including "voucher insufficient"

and "no contact" denials in conducting that analysis. Both decisions were sound and supported by statistical evidence. The court did not commit clear error.

## II. THE DISTRICT COURT DID NOT COMMIT ANY ERROR BY TREATING FULLY AND PARTIALLY SUBSIDIZED APPLICANTS SEPARATELY IN ITS ANALYSIS OF THE 2019 POLICY'S EFFECT

The district court soundly agreed with Dr. Steil that fully and partially subsidized applicants should be treated differently in the analysis of the 2019 Policy given that Goldfarb Properties subjected the two groups to different income requirements. On appeal, Goldfarb Properties makes a last-ditch effort to recast the district court's reasonable distinction as somehow inconsistent with Second Circuit law. It argues that the proper protected class at issue in this case is all subsidized applicants, and the court's finding of disparate impact as to a so-called "subgroup" of that class—partially subsidized applicants—is not enough to demonstrate disparate impact based on source of income.

As an initial matter, Goldfarb Properties never made this argument below, and it is waived on appeal. To the extent that Goldfarb ever asserted that FHJC chose a "subgroup" to conduct its disparate impact analysis, Goldfarb Properties did so only in the context of FHJC's FHA *disability* disparate impact claims, not Goldfarb Properties' counterclaim. *See* 18-cv-1564 ECF No. 144 (Defs.' Pre-Trial Proposed Findings of Fact & Conclusions of Law) at 22-23; JA 1507 (same argument made post-trial). Goldfarb Properties has never before claimed that the district court's

source-of-income analysis of its counterclaim was improper on this ground, and "[i]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quoting *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005) ("The law in this Circuit is clear that where a party has shifted his position on appeal and advances arguments available but not pressed below, . . . waiver will bar raising the issue on appeal." (quoting *United States v. Braunig*, 553 F.2d 777, 780 (2d Cir. 1977)).

More fundamentally, Goldfarb's framing makes no sense. The 2019 Policy has three distinct sets of requirements for non-subsidized applicants, partially subsidized applicants, and fully subsidized applicants. *See supra* at 9-10. Goldfarb's own expert acknowledged that the 2019 Policy "define[d] three application types and set[] different standards for each type." JA 1346. It would be improper if the district court *had* conflated fully and partially subsidized applicants in its analysis; the same practices and requirements did not apply to both, so the court properly analyzed the 2019 Policy's effect on the two populations separately.

The district court's sound approach is entirely consistent with Second Circuit law. *See Smith v. Xerox Corp.*, 196 F.3d 358, 368-69 & n.8 (2d Cir. 1999) (in disparate impact employment discrimination case based on age and gender,

plaintiff's expert only analyzed layoffs in certain individual divisions within the company, so the plaintiffs' claim of a company-wide impact was not supported by company-wide data), *overruled on other grounds by Meacham v. Knolls Atomic Power Lab'y*, 461 F.3d 134 (2d Cir. 2006). "It is only reasonable to infer a disparate impact from [a policy or practice] if all persons who were subject to the process are included in the analysis." *Id.* at 370; *see also McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 15 (D.D.C. 2004) (analyzing the entire group affected by a practice, rather than "isolate[d] units or groups," will indicate whether that practice was the cause of the disparity). That is precisely what the court did by considering partially and fully subsidized applicants separately when the 2019 Policy itself treated them differently. Contrary to Goldfarb's assertion, the district court did not create a "subgroup" of the HRL's protected "source of income" class; rather, it found that, because the 2019 Policy requirements for applicants who have partial subsidies had a disparate impact on that group, the policy violated the HRL's prohibition against discrimination based on source of income.

The additional cases Goldfarb cites do not change this conclusion. *Lowe v. Commack Union Free School District*, 886 F.2d 1364 (2d Cir. 1989), declined the plaintiffs' attempts to redefine the Age Discrimination in Employment Act's statutorily defined protected class (people over the age of 40) for purposes of the litigation. *Id.* at 1373; *see also Eidinger v. PRIMMA, LLC*, No. 19-cv-3219, 2022

29

WL 17685444, at *7-8 (E.D.N.Y. Nov. 1, 2022) (same). FHJC has done no such thing. Other cited cases concern statistical flaws also not present here: *Wharff v. State University of New York*, 413 F. App'x 406 (2d Cir. 2011) found no disparate impact where the plaintiff had cherry-picked population data (10 employment decisions out of the 18 that had occurred) to suit his analysis. *Id.* at 409. *Tsombanidis v. West Haven Fire Department*, 352 F.3d 565 (2d Cir. 2003), held that plaintiffs' disparate impact claim failed where they presented no statistical information at all. *Id.* at 576-78. And *Attenborough v. Construction & General Building Laborers' Local 79*, 691 F. Supp. 2d 372 (S.D.N.Y. 2009), held that the 18 individual plaintiffs were not a representative, statistically significant sample of the at-issue protected class. *Id.* at 376. The court explained that, in disparate impact analyses, the sample or population chosen for study must be representative of the protected class. *Id.* As explained *supra* at 15, Dr. Steil used all of *Dr. White*'s data to analyze the 2019 Policy. JA 1144. If Goldfarb claims Dr. White's data set was reliable, it cannot claim Dr. Steil's was not.

Goldfarb's last point on this issue exaggerates the reach of the district court's decision. It is simply not true that, if Goldfarb Properties is enjoined from discriminating against partially subsidized applicants based on their source of income, it will be "completely preclude[d]" from selecting or screening its tenants. Appellant Br. at 34. As the district court noted, and FHJC agrees, landlords are not

"required" to accept tenants who cannot pay the rent, and they have an interest in assessing applicants' ability to pay their rent. SPA 46. But it was *Goldfarb's* burden to prove that the 2019 Policy was necessary to achieve that claimed interest. SPA 37, 48. The court correctly held that Goldfarb Properties failed to do so. It offered no evidence that partial subsidy holders could not pay their portion of the rent unless they met the 2019 Policy minimum income requirement, and no evidence exists that partial subsidy holders are unlikely to pay the rent share they have been qualified by their relevant subsidy program to pay. SPA 48.

Therefore, even if this Court decides to review Goldfarb Properties' waived argument, the district court committed no error, let alone clear error, by treating fully and partially subsidized applicants separately given that the 2019 Policy did the same.

## III. THE DISTRICT COURT DID NOT COMMIT ANY ERROR BY INCLUDING "VOUCHER INSUFFICIENT" AND "NO CONTACT" DENIALS IN ITS ANALYSIS OF THE 2019 POLICY'S EFFECT

### A. The District Court Correctly Considered "Voucher Insufficient" Denials

The district court did not commit any error, let alone clear error, when it concluded that "voucher insufficient" denials should be included in an analysis of the 2019 Policy's disparate impact.

As Dr. Steil explained at trial, "voucher insufficient" denials do not necessarily occur because the applicant applies for an apartment with a higher rent

than a subsidy program's applicable payment standard. Nor is it the case, as Goldfarb Properties erroneously claims, that even applying for an apartment with higher rent than a program's rent payment standard somehow necessarily renders an applicant "unsubsidized."

Since Goldfarb Properties had discretion whether to deny an applicant as "voucher insufficient"—and the 2019 Policy explicitly included "voucher insufficiency" as a reason to deny an application—such denials were the result of Goldfarb's actions as much as an applicant's. JA 1150. Dr. Steil offered, and the court accepted, three considerations Goldfarb Properties might use to categorize an applicant as "voucher insufficient": (1) what rent amount to compare to the subsidy program's rent payment standard (the rent for the unit applied for or the rent for a comparable unit if the original unit was unavailable), (2) what rent amount the various subsidy programs would approve over the rent payment standard, and (3) whether, as explicitly contemplated by Section 8, the applicant may be able to afford to contribute more to the rent than their expected share (up to 40% of their income instead of 30%). JA 662, 1150.

With respect to the first factor, a Goldfarb Properties employee testified at trial that Goldfarb exercised discretion in considering what rent amount to use. For example, in those circumstances when the apartment a renter applied for was no longer available, a leasing agent may have contacted them to determine if they would

be interested in another available apartment in the same building. JA 334-35. And, as Dr. Steil testified at trial, Goldfarb Properties had still other options available, such as offering applicants comparable apartments in other of its 30 rental buildings, or instituting a waitlist to contact applicants when units within their payment range became available. JA 450, 623-24, 985.

As to the second factor, the rent amount a particular program might approve, Dr. Steil and another FHJC witness explained that, for example, the HASA program has discretion to approve a higher rent for HASA clients if it would be beneficial to that person's health to do so, *e.g.*, if the person has a disability that requires them to use an elevator, which may require renting a more expensive apartment. JA 556-57, 1028. Goldfarb Properties introduced no evidence that it inquired into whether such an exception could be allowed by the HASA program before denying an applicant as "voucher insufficient."[16] Dr. White confirmed that he accepted Goldfarb's decision to categorize an applicant as "voucher insufficient" with no independent review of the underlying basis for the determination, and likewise acknowledged

---

[16] Contrary to Goldfarb's position on appeal, *see* Appellant Br. at 26, its employee testified at trial that Goldfarb *did* assume renters with HRA-issued vouchers may have a HASA rental subsidy since HRA is the agency that operates the HASA program, JA 381.

that if certain applicants were incorrectly categorized as "voucher insufficient," that "certainly could" affect his analysis.[17] JA 654-55, 667.

Goldfarb Properties erroneously claims that requiring it to consider what rent amount to use and the amount that a subsidy program might approve imposes extra-legal obligations to treat subsidized applicants better than non-subsidized ones. To the contrary, considering what rent a subsidized applicant can pay is fully aligned with Goldfarb's own claimed interest in ensuring that applicants can pay their rent. Unsubsidized applicants and partially subsidized applicants have different sources of income, and it is therefore appropriate for Goldfarb Properties to consider factors that affect their respective abilities to pay rent. Regardless, this unsupported allegation is beside the point. The question at trial was whether "voucher insufficient" denials may be considered by the court when evaluating the impact of the 2019 Policy. Goldfarb Properties argued that they should not because such denials are a consequence of the applicants' actions only. JA 1349-50. But as Dr. Steil and a Goldfarb employee both testified, actions taken by Goldfarb's employees

---

[17] Most of Goldfarb Properties' record citations on this point, *see* Appellant Br. at 26, are inapposite. The trial testimony it cites discussed the 2015 Policy, not the 2019 Policy on appeal. *See* JA 280, 311-13. FHJC established disparate impact based on its analysis of Goldfarb's data; Goldfarb failed to show that the 2019 Policy did *not* disparately impact partially subsidized applicants.

were key to denying an application as "voucher insufficient." *See* JA 334-35, 381, 623-24.

And finally, Goldfarb Properties had the discretion to consider that under Section 8 program rules, an applicant, under certain circumstances, may be able to pay up to 40% of their income instead of 30%, making the voucher "limit" flexible for purposes of determining the maximum rent an applicant can afford. Although a Goldfarb employee testified that Goldfarb Properties "takes account of [this] option," JA 1455-56, Dr. Steil found multiple partial subsidy applicants who could have taken advantage of Section 8's flexibility but were denied as "voucher insufficient," JA 1153-54. Goldfarb Properties complains that, while he was being cross-examined on the stand, Dr. Steil could not name the applicants he identified or provide supporting figures without being shown the underlying data. Setting aside the fact that trial testimony is not intended to be a memorization game, Dr. Steil's analysis was based on Goldfarb Properties' own data. Again, the essential point is that Goldfarb Properties was an active participant in its decisions to deny applications as "voucher insufficient"; applicants were not denied on this ground simply because of their own actions.

Having considered all the above, the district court noted that "voucher insufficient" denials were a significant portion of Goldfarb's denials of subsidized applicants (more than one out of every four). It then concluded that such denials

35

should be considered in analyzing the 2019 Policy's effect.[18] JA 1150. Although remarkable, the incidence of "voucher insufficient" denials was not the "specific" or sole reason the court agreed that including them was appropriate. *Contra* Appellant Br. at 23. Instead, the court undertook a careful review of trial testimony, including each expert's testimony. *See* SPA 30-32. Its findings were "extensive" and had "support in the record." *Atl. Specialty Ins. Co.*, 945 F.3d at 69. Contrary to Goldfarb's unsupported claims, the district court did not "fundamentally misread[]" Goldfarb's data due to a misunderstanding of the type of data presented, or disregard either expert's testimony about how to interpret their respective findings. *Cf. Woodbury v. N.Y.C. Transit Auth.*, 832 F.2d 764, 770 (2d Cir. 1987) (disparate treatment case finding clear error where district court misread the data altogether). The district court's findings were sound and without error, let alone clear error.

## B. The District Court Correctly Considered "No Contact" Denials

The district court was also correct to include "no contact" denials in its evaluation of the impact of the 2019 Policy.

Testimony at trial demonstrated that "no contact" denials were not, as Goldfarb Properties suggests, a matter of applicants who "stopped responding" to

---

[18] Goldfarb attempts to make hay of the district court's decision not to consider a particular witness's application denial for "voucher insufficiency." Appellant Br. at 22; *see* SPA 47. This point is irrelevant because the district court's conclusion was based on Dr. Steil's analysis overall, not on one applicant's example. SPA 48.

Goldfarb during the application process. Rather, as a Goldfarb employee testified, "no contact" denials were equally the result of Goldfarb's agents' choices and actions: when to contact an applicant, how many attempts to make, what time of day to attempt contact, what means to use—and when to decide that an applicant could officially be categorized as "no contact." JA 330-31. Neither a Goldfarb employee nor Dr. White was aware of any written guidance for Goldfarb Properties agents regarding contact attempts or how long to wait before categorizing an applicant as "no contact," and Goldfarb Properties produced no records at trial showing what contacts were attempted. JA 330-31, 662-63. In short, the 2019 Policy was one that necessarily involved leasing agent discretion, and, thus, there was sufficient evidence to cast doubt on Dr. White's exclusion of "no contact" denials from his analysis. *Contra* Appellant Br. at 30.

Moreover, the large difference in "no contact" denials between subsidized and non-subsidized applicants (30% versus 14%) found by Dr. Steil raised the question of *why* that rate was so different. JA 1155; *see Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination."). Again, the district court's inclusion of "no contact" denials was not solely based on this statistic, but the court was well within its rights to find the

statistical disparity probative considering the other evidence presented. Goldfarb's late-raised concerns about causality are thus unfounded.

Here, FHJC presented evidence of a statistical imbalance along with evidence of Appellants' policies and practices that caused the statistical imbalance, *i.e.*, the 2019 Policy. For example, FHJC elicited testimony at trial about Goldfarb Properties' generalized discretion to deny an applicant for "no contact," which was consistent with Dr. Steil's conclusions based on comparative data. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015) (a plaintiff must point to a defendant's policy or practices that cause the statistical disparity); *see also Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 427 (4th Cir. 2018) (collecting disparate impact cases regarding role of comparative data to show a given policy's effect).

Like its findings as to "voucher insufficient" denials, the district court's findings as to "no contact" denials were detailed and substantiated, *see Atl. Specialty Ins. Co.*, 945 F.3d at 69, and "[un]contradicted by incontrovertible evidence," *Siemens Energy, Inc.*, 82 F.4th at 153. The court did not misread or misunderstand Goldfarb's data. *See Woodbury*, 832 F.2d at 770. There was no error here.

## IV.  APPELLANTS' ARGUMENTS AS TO THE ADMISSIBILITY OF DR. STEIL'S TESTIMONY AND THE PROPRIETY OF PROSPECTIVE RELIEF ARE WAIVED

Two last points, briefly. For the first time in this case, Goldfarb alleges that Dr. Steil's opinions are inadmissible under Federal Rule of Evidence 702. Appellant Br. at 24. Goldfarb has waived this argument. It did not challenge the admissibility of Dr. Steil's testimony at any time before trial, *see* JA 1-29, did not object to his qualification as an expert at trial, *see* JA 545, and engaged with his testimony on the merits, *see* JA 547-613, 635-41 (Dr. Steil's cross and re-cross examinations). The Court should not consider Goldfarb's thirteenth-hour effort to un-admit testimony that was key to the district court's factual findings. *See Bogle-Assegai*, 470 F.3d at 504.

Second, Goldfarb makes a cursory and unsupported request for the Court to vacate the injunctive and prospective relief that the district court ordered. Appellant Br. at 6. Arguments like this one, raised in "a single conclusory sentence," are waived. *Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir. 2005); *see also Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("[i]ssues not sufficiently argued in the briefs are considered waived," and "merely incorporating by reference an argument presented to the district court, stating an issue without advancing an argument, or raising an issue for the first time in a reply brief" does not adequately

39

raise that issue for appellate review). Goldfarb does not explain its request at all, and the Court should not entertain it.

But even if the Court considers Goldfarb's waived argument on this issue, prospective relief was entirely appropriate. The FHA and HRL authorize a court to provide appropriate relief, including injunctive relief, both to eliminate the discriminatory effects of past illegal policies and to prevent future discriminatory practices. 42 U.S.C. § 3613(c)(1) (the court "may grant as relief, as the court deems appropriate, any permanent or temporary injunction, . . . or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)"); N.Y.C. Admin. Code § 8-502(a) (same); *see also United States v. Yonkers Bd. of Educ.*, 837 F. 2d 1181, 1236 (2d Cir. 1987) ("A district court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." (cleaned up)).

The district court granted injunctive relief given Goldfarb's "consistent pattern" of discrimination, SPA 49, including its illegal and discriminatory 2015 *and* 2019 Policies. The 2015 Policy's illegality is not on appeal. Given that this Court reviews the scope of a district's court's injunction for abuse of discretion, which can be found if the district court "relied upon a clearly erroneous finding of fact or incorrectly applied the law," *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826

40

F.3d 27, 38 (2d Cir. 2016) (quoting *Catanzano by Catanzano v. Wing*, 103 F.3d 223, 228 (2d Cir. 1996)), and the district court committed no clear error, it did not abuse its discretion in ordering injunctive relief.

## CONCLUSION

The district court carefully considered the evidence before it in finding the 2019 Policy unlawful and committed no error, let alone any clear error, in crediting Dr. Steil's testimony or analyzing the 2019 Policy's effects as it did. For these reasons, and because Goldfarb's other arguments are waived, the district court's judgment should be affirmed.

Dated:     May 3, 2024
           New York, New York

                        EMERY CELLI BRINCKERHOFF
                        ABADY WARD & MAAZEL LLP


                        */s/ Diane L. Houk*
                        Diane L. Houk
                        Sonya Levitova

                        600 Fifth Avenue, 10th Floor
                        New York, New York 10020

                        (212) 763-5000

                        *Attorneys for Plaintiff-Appellee*

42

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(A). It contains 9,617 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman typeface.

Dated: May 3, 2024

*/s/ Sonya Levitova*
**Sonya Levitova**
Attorney for Plaintiff-Appellee